[No. D055150. Fourth Dist., Div. One. July 8, 2011.]

SILVERADO MODJESKA RECREATION AND PARK DISTRICT et al.,
Plaintiffs and Appellants, v.
COUNTY OF ORANGE et al., Defendants and Respondents;
CCRC FARMS, LLC, et al., Real Parties in Interest and Respondents.

**Counsel**

Angel Law, Frank P. Angel and Jeff El-Hajj for Plaintiffs and Appellants Rural Canyons Conservation Fund and Ray Chandos.

Shute, Mihaly & Weinberger, Winter King and Gabriel M. B. Ross for Plaintiff and Appellant Silverado Modjeska Recreation and Park District.

Jonathan Evans for Center for Biological Diversity as Amicus Curiae on behalf of Plaintiffs and Appellants Rural Canyons Conservation Fund and Ray Chandos.

Nicholas S. Chrisos, County Counsel, and Mark Servino, Deputy County Counsel, for Defendants and Respondents.

Irell & Manella, John C. Hueston, Richard J. McNeil and Carlton Morse for Real Parties in Interest and Respondents.

## OPINION

**BENKE, Acting P. J.**—In this case we consider an environmental review process which commenced in 2002. During the course of that process the developers of a residential real estate project prepared an environmental impact report (EIR) which was certified by a county board of supervisors in 2003. The EIR was challenged in a prior writ proceeding and as a result of the challenge a writ was issued compelling the county and the developers to prepare a supplemental EIR (SEIR) which more thoroughly considered the impact of the project on water quality. The SEIR was circulated and certified in 2007.

Appellants contend that in this second proceeding under the California Environmental Quality Act (CEQA) (Pub. Resources Code,[1] § 21000 et seq.) they had the right to challenge the developers' and the county's compliance with the prior writ compelling them to prepare and circulate the SEIR which considered the impact of the project on water quality. We reject this contention. An order discharging the earlier writ and determining the 2007 SEIR properly evaluated whether the project's impact on water quality was otherwise adequate was entered in the prior proceeding and became final during the pendency of the instant action.

We also reject appellants' contention that, following circulation of a draft version of the SEIR, the county should have recirculated the SEIR with a reference to the then recent observation of larvae of an endangered toad species in a creek near the project and permitted public comment on that fact. The county's decision to approve the SEIR without recirculation is supported by a number of circumstances disclosed in the record: the 2003 EIR assumed the toad species had been observed in the vicinity of the project but determined the project would have no significant impact on the toad because the toad was not observed on the site of the proposed development and the site was not a suitable habitat for the toad; public comment on the adequacy of this analysis was received and in challenging the adequacy of the 2003 EIR, appellants argued, among other matters, that observation of the toad in

---

[1] All further statutory references are to the Public Resources Code unless otherwise indicated.

the vicinity of the project required further study of the impact of the project on the toad; and finally, although there was conflicting expert opinion, an expert retained by the developers concluded that the larvae sighting was not significant. Given the information about the toad provided in the 2003 EIR, the public comment on that information and later litigation, as well as the expert's appraisal of the significance of the larvae sighting, the county could reasonably determine the public had been given adequate opportunity to comment on the potential impact of the project on the toad and therefore the then recent observations of the toad in the vicinity of the project site did not constitute new material information which required recirculation of either the 2003 EIR or the 2007 SEIR.

Because the county's compliance with the earlier writ and the adequacy the SEIR had been determined in the prior proceeding and because the county was not required to recirculate the 2003 EIR or the 2007 SEIR, we affirm the trial court's judgment insofar as it denied appellants' petition challenging the validity of the 2007 SEIR.

However, we reverse a postjudgment order which compels payment of attorney fees to the developers from one of the appellants. Because the developers' attorney fees claim is based on the terms of an agreement between the developers and appellant, it should not have been resolved by way of a motion for attorney fees in this CEQA proceeding and in any event the trial court erred in finding that appellant breached the terms of its agreement with the developers.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *2003 EIR*

On August 1, 2002, defendant and respondent County of Orange (the county),[2] in its capacity as lead agency under CEQA, gave notice of its intention to prepare an EIR for a project known as Silverado Canyon Ranch. Real parties in interest and respondents CCRC Farms, LLC, Anthony A. Marnell II, Marnell Corrao Associates, Inc., and Focus 2000, Inc. (collectively CCRC), are the developers of Silverado Canyon Ranch.

As proposed by CCRC, Silverado Canyon Ranch consists of 12 custom home sites, averaging 5.3 acres per lot, on 68.7 acres of privately held land within the boundaries of the Cleveland National Forest. The project site was formerly part of a family farm known as Holtz Ranch.

---

[2] All references to the county include defendant and respondent Board of Supervisors of the County of Orange.

In 2003, the county circulated a draft EIR which included a biological study of the project. With respect to sensitive wildlife species, the drafters of the study found only one sensitive species, a Cooper's hawk (*accipiter cooperii*), on the project site. However, the hawk was not nesting on the project site, but was only observed perched on a eucalyptus tree.

Importantly, the 2003 biological study included a list of "sensitive wildlife species that have been recorded in the site vicinity but have not been detected on the site." The arroyo toad, *bufo microscaphus californicus*, was among the species listed in the 2003 biological study as having been recorded in the vicinity of the project but not detected on the site of the project. The draft EIR concluded the probability of the arroyo toad occurring on the project site was "very low; no suitable habitat, nearest population is 1.5 km away in Silverado Creek." Based on the finding of only one nonnesting sensitive bird species on the project site, the 2003 biological study concluded the project would not result in direct or indirect impacts to any sensitive species listed as threatened or endangered by either the United States Fish and Wildlife Service (USFWS) or California's Department of Fish and Game (CDFG).

In response to the draft 2003 EIR, members of the public commented negatively on the analysis in the biological study, and in particular its conclusion that the arroyo toad was not present on the project site and would not be indirectly impacted by the project. One commenter stated: "How can it be assumed that, for example Arroyo Toad, Quino Checkerspot (QCB) and Burrowing Owl do not occur on this site? Arroyo Toad is known to occur in Santiago Creek (CDFG 2002). All three of these species require a protocol survey to be conducted in order to show presence or absence. Failure to detect a given individual species during site visits of general or other focus does not necessitate their absence. . . . There is throughout the [draft EIR] an implicit assumption that because no sensitive species other than Cooper's Hawk was detected, there is no potential for their occurrence. This implies that every species that inhabits the project site in any form was detected during the site visits made by [the drafters of the biological study.] This is simply not a reasonable assumption."

Another commenter stated: "[T]he DEIR states that arroyo southwestern toads were not detected on the site. However the toad has been found in the vicinity of the site (35 juveniles observed in Silverado Creek; see Federal Register, Volume 65, Number 111; Proposed designation of critical habitat for the arroyo southwestern toad.) Therefore it is highly likely the project will have a significant indirect impact on this federally listed species."

A third commenter stated: "No arroyo toad (a listed threatened/endangered species documented to exist in the area) studies were done on-site, including upon the 46 acres that SHOULD have been listed as part of the project."

In response to these comments, the final EIR states: "At best the Silverado Canyon site (the site) provides marginally suitable habitat for the arroyo southwestern toad. The lack of potential for this species to breed or over-winter on the site has been confirmed by NRC's biologist Mr. Lee Jones. This conclusion appears [*sic*] to be shared by Mr. William Haas of Varanus Biological Services, Inc., whose letter was submitted by the appellants. The on site conditions are not typical of areas used [by] arroyo toads during the breeding season or other times of the year. There are not records for this species on the site nor is the site located within the boundaries of the designated 'Critical Habitat' for this species. In addition, the known locations for this species in this region are defined by substantially different environmental conditions than those on the site.

"As described FEIR Response to Comment A1-2, the site was re-evaluated for its potential to harbor the federally endangered arroyo southwestern toad, and it was concluded that no suitable habitat exists on-site either for breeding or for foraging."

The final EIR noted that the arroyo toad had been seen 1.5 miles downstream from the project but concluded that no USFWS protocol level survey was necessary: "A protocol-level search would require that a qualified biologist conduct at least six day and six night visits (same 24-hour period) to areas of suitable arroyo toad habitat between March 15 and June 1. Based on the existing conditions at the Silverado Ranch site and the fact that this species has not been located in similar habitats in this region, there is little justification for a detailed study to conclusively determine the absence of the species from the site."

Following circulation of the draft 2003 EIR, the receipt of comments and the preparation of responses to the comments, the county certified the final EIR for the project in August 2003.

### 2. *Challenges to 2003 EIR*

After the county certified the final EIR for the project in August 2003 and again after the county approved a tentative subdivision map for the project in October 2003, plaintiffs and appellants Rural Canyons Conservation Fund and Ray Chandos (collectively Rural Canyons) challenged the actions taken by the county in two petitions for writ of mandate filed in the Orange County Superior Court. After Rural Canyons's petitions were filed, its petitions were consolidated as *Rural Canyons v. County of Orange* (Super. Ct. Orange County, 2008, No. 03CC00422).

Rural Canyons challenged the adequacy of the 2003 EIR on a number of grounds, including but not limited to the failure of the EIR to identify as a

significant impact the substantial grading required for the project, the absence of both quantitative data with respect to existing water quality and quantitative data with respect to the impact of the project on water quality, the failure to identify mitigation measures for the loss of coastal scrub, and the cumulative impact of the project.

Of significance here, Rural Canyons's 2003 petition also alleged: "Despite evidence in the record that the Arroyo Toad, a federally endangered species, has been found near the Project site, both upstream and downstream of the site, and despite the fact that directed surveys for this species were never conducted for the Project by the EIR preparers, the EIR concludes that the Project would have no significant impact on the Arroyo Toad. This conclusion is not supported by substantial evidence in the light of the whole record."

The trial court granted Rural Canyons's petition with respect to its claims that the EIR was inadequate in its failure to adopt appropriate mitigation measures for the loss of coastal sage scrub and in its failure to properly evaluate and mitigate the impact of the project on water quality. However, with respect to Rural Canyons's remaining claims, including its allegation the EIR did not properly evaluate the impact of the project on the endangered arroyo toad, the trial court found that "the Respondents' findings are supported by substantial evidence and Respondents have proceeded in the manner required by law."

In light of its determination of Rural Canyons's claims, on August 23, 2004, the trial court entered a judgment which in part granted Rural Canyons's claims for relief and in part denied them. In addition to the judgment, the court issued a writ that in part commanded the county to "[o]btain a study of the baseline water conditions and quality in the project area," and to "[p]repare and circulate a supplemental EIR disclosing and evaluating the baseline water data collected and tested for, and the baseline water conditions and quality reviewed in, the study. . . ." The writ further ordered the county to provide public hearings on the actions that it took "to comply with this Court's judgment and writ."[3]

### 3. *Postjudgment Proceedings*

None of the parties challenged the trial court's 2003 judgment granting in part and denying in part Rural Canyons's claims.

---

[3] The writ also commanded the county to amend the EIR "to adopt the mitigation measure of replacement of coastal sage scrub habitat at a 1 to 1 ratio on the project site and amend the mitigation and monitoring reporting program for the project accordingly, as necessary." The county's compliance with this aspect of the trial court's writ is not at issue in this case.

CCRC retained a civil and environmental engineering company to prepare a baseline water quality study for the county to use in preparing the SEIR. The county circulated a draft SEIR that incorporated the water quality study and addressed the project's impacts on water quality.

In April 2005, during the public comment period for the draft SEIR, Robert Haase, a zoologist with the Department of Defense, discovered arroyo toad larvae in Silverado Creek approximately 330 feet from the project site.[4] Haase did not find any metamorphic, subadult or adult individuals at that time or location.

In May 2005, Haase confirmed two more sightings of the arroyo toad in the general vicinity. Between June 17 and June 21, 2005, in surveys conducted for a different developer, biologist T'Shaka A. Toure reported sighting 25 to 35 arroyo toads between the stages of late tadpole to early metamorphosis in Silverado Creek, 1.6 miles downstream from the project.

Rural Canyons and others notified the county of the arroyo toad sightings and asked the county to circulate a revised SEIR to address the impacts of the project on the arroyo toad and its habitat.

CCRC retained biologist Peter Bloom to survey the project site and the portion of Silverado Creek that is adjacent to the site, for the presence of arroyo toads. Bloom looked for arroyo toads in that area on five days and nights between June 29 and July 27, 2005. In addition, on six days and nights in the following year—between March 24, 2006, and July 16, 2006—Bloom conducted a second survey of the area. Bloom reported that he found no evidence of arroyo toads.

In support of their request for recirculation, project opponents presented a letter from a USFWS biologist, who was concerned that, in light of the Haase and Toure observations and notwithstanding the Bloom surveys, there was a high likelihood the arroyo toad was present on or near the project site. The biologist reasoned as follows: "Although arroyo toads were not observed at Silverado Creek in 2006, they can remain buried in the soil for extended periods of time, emerging to breed or forage only when conditions are appropriate, so based on the observation of breeding arroyo toads at this location in 2005, it is likely that toads are still present in suitable habitat along Silverado Creek. This population of arroyo toads appears to breed intermittently and may be particularly difficult to observe on a year to year

---

[4] Haase explained to the county planning commission that he went to the site to look for arroyo toads, out of curiosity, after a local resident asked him about the resident's "sightings of unusually small toads that resembled the creek gravel . . . ." The resident showed Haase a photograph of one of the toads that the resident saw. Haase recognized it as an arroyo toad.

basis, as evidenced by the fact that, prior to 2005, the last documented observation of arroyo toads in the immediate area was in 1985 . . . ."[5]

The principal biologist retained by CCRC, David Levine, strongly disagreed with the USFWS biologist as to the significance of Haase's observation of toad larvae near the project site and the probability arroyo toads were present on the project site. At the hearing at which the SEIR was certified, Levine stated: "The information that is out there that wasn't in the EIR and it went through our offices is that there are larvae found in 2005, period. That is the only fact that we have to deal with. Where those larvae came from, what the adults were, whether or not those turned into—metamorphed into adults, nobody knows. [¶] . . . [¶] . . . [Y]ou kind of have to use a probability analysis. If we've only got a handful of larvae, no adult sightings, the probability of [the toads reaching the project site] gets to be very far removed. You know, many orders of magnitude for that actually to occur that there be an adult toad estivating on the Holtz Ranch. That would be a very unlikely event in my opinion . . . ."

Levine also recognized that arroyo toads have a 1,000-foot dispersal zone and the project was within that zone. However, because Haase only reported seeing a relatively small number of toad larvae,[6] Levine did not believe it was proper to measure their dispersal zone from the point of the Haase sighting.

The county certified the final SEIR on October 2, 2007, without recirculating a draft which noted the Haase observation of toads in the vicinity of the project. The SEIR noted Haase's recent arroyo toad larvae sightings, but rejected the request of commenters that in light of the sightings the SEIR be recirculated: "The issue of alleged project impacts to the Arroyo Toad and the Toads presence near the Project site (both upstream and downstream) was alleged in the *Rural Canyons Conservation Fund v. County of Orange*, et al, Orange County Superior Court Case No. 03CC00422. The Court rejected this claim and found the County had supported its previous determination with substantial evidence. This portion of the EIR remains valid. The commenter provides no new evidence about the Arroyo Toad or habitat that was not already considered or known when the FEIR was certified."

---

[5] Haase largely agreed with the biologist's description of the toad's behavior. Haase told the planning commission that the arroyo toad had not been seen in that area since 1984, and that the toad "can go for long periods of time being undetected despite protocol surveys or any other kind of surveys. It really takes a prolonged period to detect them, especially in these types of habitats . . . ."

[6] See footnote 17, *post.*

### 4. *Discharge of Writ and Challenge to 2007 SEIR*

On November 5, 2007, Rural Canyons filed a new action in Orange County Superior Court, case No. 37-2008-00087783, challenging the validity of the SEIR. Silverado Modjeska Recreation and Park District (the District) joined Rural Canyons as a petitioner in the 2007 action, which was assigned to the same judge who was still presiding over the 2003 action.

#### a. *Discharge of Writ*

Shortly after Rural Canyons and the District initiated their 2007 action, CCRC moved in the 2003 action to discharge the trial court's earlier writ in the 2003 action. The parties submitted a substantial administrative record concerning whether the water quality study complied with the writ and CEQA, and extensively briefed those issues on the motion to discharge the writ. Acting in the 2003 action, the trial court granted the motion to discharge the writ. The trial court's order granting the discharge states: "[T]he County has complied with the commands of the Writ, thereby justifying the Writ being discharged. The Court further finds that in so complying with the commands of the Writ, the County has complied with CEQA\* *with respect to the issues alleged in the instant action.*"[7] Rural Canyons did not appeal from the order discharging the writ in the 2003 action.

#### b. *Challenge to 2007 SEIR*

On the same day it heard CCRC's motion to discharge the writ in the 2003 action, the trial court heard Rural Canyons's and the District's motion to transfer their 2007 action to a neutral county pursuant to Code of Civil Procedure section 394. The trial court granted the motion and transferred the 2007 action to the San Diego County Superior Court.

The 2007 petition alleged two substantive causes of action: the first cause of action alleged the SEIR did not comply with the writ issued in the 2003 action; the second cause of action alleged the discovery of the arroyo toad constituted significant new information and that the county's failure to circulate a revised SEIR to address the discovery of the arroyo toad violated CEQA. After the 2007 action was transferred to San Diego County Superior Court, the trial court heard CCRC's demurrer to the petition. The trial court sustained CCRC's demurrer to the first cause of action without leave to amend and overruled the demurrer to the second cause of action.

In sustaining CCRC's demurrer to the first cause of action, the trial court noted that the order discharging the writ in the 2003 action included a finding

---

[7] The italicized portion of the trial court's order appears to have been handwritten by the trial judge.

the county had "made a proper return to [the] peremptory writ by amending the EIR, obtaining a study of the baseline water conditions, and preparing and circulating the SEIR regarding the baseline water conditions and quality." The trial court further noted that the judge in the 2003 action "found the County had complied with the commands of the writ issued in the 2003 action, dismissed the writ, determined the County had complied with CEQA with respect to the issues alleged in the 2003 action, and deemed the action closed."[8]

In overruling the demurrer to the second cause of action, the trial court noted the 2007 action made allegations about the impact of new arroyo toad observations which were not litigated in the 2003 proceeding. In light of the trial court's ruling on the demurrer, the trial court eventually issued an order which limited the parties' briefing to the 2007 petition's arroyo toad allegations.[9]

---

[8] Although the trial court did not *expressly* refer to the doctrine of res judicata in sustaining CCRC's demurrer to the first cause of action, CCRC demurred to the first cause of action on the ground of res judicata, and the trial court's reference to the order discharging the writ in the 2003 action indicates that res judicata was the basis for the court's ruling on the first cause of action. The only actual reference to "res judicata" in the order on CCRC's demurrer appears in the paragraph in which the court overruled the demurrer as to the second and third causes of action. That paragraph begins with the following language from the court's earlier *tentative* ruling, *which overruled the demurrer entirely*, including as to the first cause of action: "The 2007 case at bar is not subject to res judicata as a result of any ruling in the [2003 action] in Orange County. The parties . . . in the [2003 action] decided in Orange County, and the 2007 case transferred to San Diego County from Orange County are not identical nor are the issues." Because the statement that the 2007 action is *not* subject to res judicata as a result of any ruling in the 2003 action is inconsistent with the court's sustaining the demurrer as to the first cause of action, we presume that the court intended the statement to apply to the second and third causes of action, only.

[9] The petition alleged a third cause of action, entitled "Failure of Respondents To Adopt A Legally Adequate Mitigation Reporting or Monitoring Program, and Failure to Take Action Supported by Legally Adequate Findings, and Supported by Substantial Evidence In Light of the Whole Record." The third cause of action alleged the county "failed to adhere to [the judgment in the 2003 action] in that they failed to disclose appropriate analysis of mitigation measures to be taken to protect water quality." The third cause of action alleged, generally, that in certifying the SEIR, the county "failed to properly determine the project's significant environmental effects; made findings that as a matter of law[] do not sustain certification of the final SEIR and approval of the entitlements granted for the project; and made findings that are unsupported by substantial evidence in the record." The third cause of action also challenged the adequacy of the reporting or monitoring program for the project and charged the county with improperly deferring the formulation of mitigation measures without disclosing performance standards, alleging that the county's "findings and mitigation monitoring program constitute a prejudicial abuse of discretion under CEQA . . . ." The trial court in the instant action referred to the third cause of action as "a catch-all reincorporating [the first and second causes of action]." The trial court did not expressly address the third cause of action in its ruling denying the petition for writ of mandate, and Rural Canyons does not address it in this appeal. We similarly decline to address the third cause of action except to note that to the extent that cause of action challenges the adequacy of the SEIR with respect to the water

The trial court ultimately denied the petition and entered judgment in favor of the county and CCRC.

## DISCUSSION

## I

### *Rural Canyons's Appeal*

On appeal Rural Canyons argues the trial court erred in sustaining without leave CCRC's demurrer to the water quality allegations set forth in the 2007 petition's first cause of action and in thereafter denying the petition with respect to the remaining arroyo toad allegations. We find no error in either ruling.

### A. *Res Judicata Bar to Litigation of Water Quality Issues*

We reject Rural Canyons's contention that the trial court erred in determining the 2007 petition's first cause of action is barred under the doctrine of res judicata. In the first cause of action, entitled "NONCOMPLIANCE WITH THE PEREMPTORY WRIT OF ADMINSTRATIVE MANDAMUS," the 2007 petition alleges the SEIR does not adequately comply with the directive in the writ issued in the 2003 action that required the county to evaluate the baseline water conditions and quality in the project area, and to state what measures would be used to mitigate the environmental impacts of the project on water quality. The 2007 petition sought "mandate relief" under the first cause of action "including an order denying discharge of the writ."

■ "Res judicata or claim preclusion precludes the relitigation of a cause of action that previously was adjudicated in another proceeding between the same parties or parties in privity with them. [Citation.] Res judicata applies if (1) the decision in the prior proceeding is final and on the merits; (2) the present proceeding is on the same cause of action as the prior proceeding; and (3) the parties in the present proceeding or parties in privity with them were parties to the prior proceeding." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1202 [24 Cal.Rptr.3d 543].)

■ "Two proceedings are on the same cause of action if they are based on the same 'primary right.' [Citation.] The plaintiff's primary right is the

quality issues, it is subsumed by the first cause of action, and to the extent it challenges the county's failure to revise and circulate the SEIR to adequately address the arroyo toad, it is subsumed by the second cause of action.

right to be free from a particular injury, regardless of the legal theory on which liability for the injury is based. [Citation.] The scope of the primary right therefore depends on how the injury is defined. A cause of action comprises the plaintiff's primary right, the defendant's corresponding primary duty, and the defendant's wrongful act in breach of that duty. [Citation.] [¶] An injury is defined in part by reference to the set of facts, or transaction, from which the injury arose." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles, supra*, 126 Cal.App.4th at pp. 1202–1203.) In a CEQA proceeding, the right to ensure the lead agency's compliance with CEQA's substantive and procedural requirements with respect to a particular environmental impact is a primary right. (*Id.* at p. 1203 [res judicata applied where CEQA causes of action in two proceedings concerned "the same project, the same EIR, and substantially the same findings"].)

Res judicata bars the 2007 petition's first cause of action because that cause of action is based on the same primary right that the court in the 2003 action adjudicated in deciding the county's motion to discharge the writ, namely, the right to ensure the county's compliance with the writ's directives to obtain a study of the baseline water condition and quality in the project area, to circulate an SEIR evaluating the baseline water data collected, and to state the measures to be used to mitigate any environmental impacts of the project on water quality. The parties submitted a substantial administrative record concerning whether the water quality study complied with the writ and CEQA, and extensively briefed those issues on the motion to discharge the writ. In the order discharging the writ, the court stated: "The Court hereby finds that the County has complied with the commands of the subject [w]rit issued in the 2003 [a]ction. As the Court stated on the record at the [h]earing on [CCRC's] [m]otion, the Court is of the opinion that the County has complied with the commands of the [w]rit, thereby justifying the [w]rit being discharged. The Court further finds that in so complying with the commands of the [w]rit, the County has complied with CEQA\* with respect to the issues alleged in the instant action. The Court further finds that the 2003 [a]ction is closed. The Court takes no position and has rendered no view on the 2007 [a]ction."

The trial court's unambiguous ruling that the county complied with the commands of the writ and that in doing so, complied with CEQA "with respect to the issues alleged in [the 2003] action" reflects full adjudication of the issues and the primary right that plaintiffs sought to litigate through their first cause of action in the instant action. The order discharging the writ in the 2003 action decided the merits of the issue of the county's compliance with the writ, and is final.

■ Rural Canyons contends res judicata is not a bar to the first cause of action in the instant action because the District was not a party to the 2003

action, and is not in privity with a party to the 2003 action. " 'In a new action on a *different* cause of action, a former judgment is conclusive against the parties and persons in privity with them on issues litigated in the former action. [Citation.]' [Citation.] ' "Privity is essentially a shorthand statement that collateral estoppel is to be applied in a given case; there is no universally applicable definition of privity." [Citation.] The concept refers "to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is 'sufficiently close' so as to justify application of the doctrine of collateral estoppel." ' " (*Executive Risk Indemnity, Inc. v. Jones* (2009) 171 Cal.App.4th 319, 325, fn. 7 [89 Cal.Rptr.3d 747].)

Rural Canyons and the District stated in their complaint that they brought the instant action "on their own behalf and on behalf of all other citizens interested in [the County's] compliance with CEQA and the Guidelines." Rural Canyons's petition and complaint in the 2003 action similarly stated that the 2003 action was brought "for the purpose of enforcing important public policies of the State of California with respect to the protection of environmental values, public health and public participation under CEQA." Rural Canyons and the District's pursuit of CEQA claims on the public's behalf in this action against the same parties Rural Canyons named in the 2003 CEQA action—which was also brought on the public's behalf—"is sufficient to show a 'common interest' in the enforcement of CEQA, for purposes of a privity determination." (*Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 230 [103 Cal.Rptr.3d 124] (*PCL*), citing *Consumer Advocacy Group, Inc. v. ExxonMobil Corp.* (2008) 168 Cal.App.4th 675, 689–693 [86 Cal.Rptr.3d 39] [two organizations that alleged distinct causes of action in the public interest against the same defendant under same antipollution statute were in privity].)[10]

Rural Canyons also contends certain statements the trial court made in its tentative ruling and during oral argument on CCRC's motion to discharge the writ demonstrate the court did not intend to preclude Rural Canyons or the District from challenging the SEIR or the county's writ compliance in the present action. In its *tentative* ruling on CCRC's motion to discharge the writ in the 2003 action, the trial court stated: "The court . . . finds that by discharging the writ the court has not deprived petitioners of the ability to now challenge the adequacy of the SEIR. By accepting the affirmations in the

---

[10] If the common objective of representing the public interest in a lead agency's compliance with CEQA were not sufficient to establish privity between two parties for purposes of res judicata, the lead agency's compliance with CEQA would be subject to continuing challenges by different parties successively asserting similar claims, in contravention of the legislative goal of avoiding delay and achieving prompt resolution of CEQA claims. (See *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1987) 189 Cal.App.3d 498, 504 [234 Cal.Rptr. 527]; *Dakin v. Department of Forestry & Fire Protection* (1993) 17 Cal.App.4th 681, 686–687 [21 Cal.Rptr.2d 490].)

County's return to the writ, the court in no way supports the validity of the contents of the SEIR or the accuracy of the findings of the baseline water conditions study. That is a matter for the new action."[11] Referring to that portion of its tentative ruling during oral argument, the trial court stated: "I'm trying to suggest [the order discharging the writ] is not res judicata in the next step."

The trial court later stated: "[The 2003 action] is closed and I in no way render an opinion or suggestion as to what the issues are in the [2007] case." When asked whether the court was suggesting that the issues in the 2003 action should be relitigated, the trial court stated: "The court's of the opinion that the County has complied with the commands of the writ justifying the writ being discharged. That in so complying with the commands of the writ it is in compliance with CEQA to the extent that the deficiencies found by the court in the [2003] action existed. The court takes no position and has rendered no view on the [2007] case except that it needs to go to a neutral county."

■ "[A] judge's comments in oral argument may never be used to impeach the final order, however valuable to illustrate the court's theory they might be under some circumstances." (*Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, 633 [7 Cal.Rptr.3d 715].) Similarly, a trial court's tentative ruling is not binding on the court; the court's final order supersedes the tentative ruling. (*Ibid.*; *Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233, 1238 [104 Cal.Rptr.3d 145, 223 P.3d 15].) A trial court's final order on a motion is "made a matter of record in order to avoid any uncertainty as to what its action has been. [Citation.] The record may be made by a written order signed by the judge and filed with the court [citation] or it may be set forth in detail in the court's minutes [citations]. But either way, a writing is essential to avoid the uncertainty that can arise when attempting to enforce an oral ruling. Indeed, an 'order' is defined by statute as the 'direction of a court or judge, *made or entered in writing . . . .*' (Code Civ. Proc., § 1003, italics added.) [¶] . . . An oral ruling is subject to varying memories and may not be clear or specific. Nor is an oral [or tentative] ruling necessarily the unequivocal decision of the court. A court may change its ruling until such time as the ruling is reduced to writing and becomes the [final] order of the court." (*In re Marcus* (2006) 138 Cal.App.4th 1009, 1015–1016 [41 Cal.Rptr.3d 861].)

Accordingly, we disregard the trial court's tentative ruling and the comments the court made during oral argument on the motion to discharge the writ in the 2003 action, and consider only the trial court's final order on the

---

[11.] We have disregarded certain handwritten notations of unknown origin that appear on the copy of the tentative ruling in the record.

motion. That order, on its face, constitutes a full and final adjudication of the issue of the county's compliance with the commands of the writ.[12]

### B. County's Decision Not to Circulate a Revised SEIR to Address the Arroyo Toad Sightings

Next, Rural Canyons contends the county violated CEQA by failing to circulate a revised SEIR following Haase's 2005 observation of the arroyo toad near the project site. As we have indicated, we find the county's decision is supported by substantial evidence in the record.

### 1. New Information Within the Meaning of Sections 21092.1 and 21166

The principles governing recirculation either after the close of the comment period following release of a draft EIR but before certification of a final EIR (§ 21092.1)[13] or after certification of a final EIR (§ 21166)[14] were discussed at length by the court in *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1130 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*). In *Laurel Heights II* the court considered the claim of the opponents of a hospital expansion project that because of additions made to an EIR following the close of the comment period section 21092.1 required recirculation of the EIR.

 Because section 21166 governs an analogous situation and because of the similarity in terms employed by the Legislature in both statutes, in

---

[12] Even if the trial court in the 2003 action did not fully adjudicate the issue of the county's compliance with the writ in ruling on CCRC's motion to discharge the writ, arguably the San Diego County Superior Court lacked jurisdiction to decide that issue in the instant action. (§ 21168.9, subd. (b); but see *PCL, supra*, 180 Cal.App.4th at p. 228 & pp. 228–229, fn. 11 [a successful plaintiff in a CEQA suit may prosecute a new action in a different court to challenge a revised or supplemental EIR prepared in response to a writ].) We need not and do not reach this issue.

[13] Section 21092.1 provides: "When *significant new information* is added to an environmental impact report after notice has been given pursuant to Section 21092 and consultation has occurred pursuant to Sections 21104 and 21153, but prior to certification, the public agency shall give notice again pursuant to Section 21092, and consult again pursuant to Sections 21104 and 21153 before certifying the environmental impact report." (Italics added.)

[14] Section 21166 provides: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:

"(a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report.

"(b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.

"(c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

interpreting section 21092.1 the court found it appropriate to look to the terms of section 21166 and its implementing guidelines.[15] (*Laurel Heights II, supra*, 6 Cal.4th at p. 1129.) In addition to section 21166 and its implementing guidelines, the court found the reasons that public comment in the CEQA review process is initially solicited also helped guide interpretation of section 21092.1: "The primary reason for soliciting comments from interested parties is to allow the lead agency to identify, at the earliest possible time, the potential significant adverse effects of the project and alternatives and mitigation measures that would substantially reduce these effects. [Citation.]" (6 Cal.4th at p. 1129.)

■ The court in *Laurel Heights II* concluded that, in light of the provisions of section 21166 and its implementing guidelines, as well as the reasons public comment is solicited, the standard for recirculation is not whether new information or changes to an EIR adds to information provided in a previously circulated document. Rather, "the addition of new information to an EIR after the close of the public comment period is not 'significant' unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect . . . ." (*Laurel Heights II, supra*, 6 Cal.4th at p. 1129.) Thus recirculation of an uncertified EIR under section 21092.1, is "not required where the new information added to the EIR 'merely clarifies or amplifies [citations] or makes insignificant modifications in [citation] an adequate EIR.' [Citation.]" (*Laurel Heights II, supra*, 6 Cal.4th at pp. 1129–1130.)

However, recirculation is required under section 21092.1 when "the new information added to an EIR discloses (1) a new substantial environmental impact resulting from the project or from a new mitigation measure proposed to be implemented (cf. Guidelines, § 15162, subd. (a)(1), (3)(B)(1)); (2) a substantial increase in the severity of an environmental impact unless mitigation measures are adopted that reduce the impact to a level of insignificance (cf. Guidelines, § 15162, subd. (a)(3)(B)(2)); (3) a feasible project alternative or mitigation measure that clearly would lessen the environmental impacts of the project, but which the project's proponents decline to adopt (cf. Guidelines, § 15162, subd. (a)(3)(B)(3), (4)); or (4) that the draft EIR was so fundamentally and basically inadequate and conclusory in nature that public

---

[15] References to "Guidelines" are to the administrative guidelines for the implementation of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.) The California Supreme Court "has not decided the issue of whether the Guidelines are regulatory mandates or only aids to interpreting CEQA . . . ." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).) However, the Supreme Court has instructed that at minimum, "courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Ibid.*)

comment on the draft was in effect meaningless [citation]." (*Laurel Heights II, supra,* 6 Cal.4th at p. 1130, fn. omitted.)

■ The court in *Laurel Heights II* pointed out that the first three circumstances that require recirculation under section 21092.1 also require recirculation under section 21166. Only the fourth circumstance—a fundamentally inadequate draft EIR which makes public comment inadequate—applies exclusively under section 21092.1. This differential exists because of the different circumstances governed by the statutes: "In the case of a certified EIR, which is a prerequisite for application of section 21166, section 21167.2 mandates that the EIR be conclusively presumed valid unless a lawsuit has been timely brought to contest the validity of the EIR. This presumption acts to preclude reopening of the CEQA process even if the initial EIR is discovered to have been fundamentally inaccurate and misleading in the description of a significant effect or the severity of its consequences. After certification, the interests of finality are favored over the policy of encouraging public comment.

"By way of contrast, section 21092.1 was intended to encourage meaningful public comment. [Citation.] Therefore, new information that demonstrates that an EIR commented upon by the public was so fundamentally and basically inadequate or conclusory in nature that public comment was in effect meaningless triggers recirculation under section 21092.1." (*Laurel Heights, supra,* 6 Cal.4th at p. 1130.)

In summarizing the intention of the Legislature in enacting section 21092.2 and in particular its adoption of the "significant new information" language, the court stated: "[T]he Legislature apparently intended to reaffirm the goal of meaningful public participation in the CEQA review process. [Citation.] It is also clear, however, that by doing so the Legislature did not intend to promote endless rounds of revision and recirculation of EIR's. Recirculation was intended to be an exception, rather than the general rule. Significantly, at the time section 21092.1 was enacted, the Legislature had been and was continuing to streamline the CEQA review process. Recognizing the legislative trend, we previously have cautioned: '[R]ules regulating the protection of the environment must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement.' [Citation.]" (*Laurel Heights II, supra,* 6 Cal.4th at p. 1132, fn. omitted.)

2. *Standard of Review*

Importantly, in determining whether the lead agency erred in failing to recirculate the challenged EIR, the court in *Laurel Heights II* applied the

substantial evidence standard of review. (*Laurel Heights, supra,* 6 Cal.4th at p. 1135.) Under CEQA "substantial evidence" is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) " '[I]n applying the substantial evidence standard, "the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision." ' [Citation.]" (*Laurel Heights II, supra,* 6 Cal.4th at p. 1135, quoting *Laurel Heights I, supra,* 47 Cal.3d at p. 393 and *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12].)

### 3. *The County's Decision*

The parties dispute which statute applies to the county's determination that the SEIR could be certified without recirculation. Rural Canyons argues the controlling statute is section 21092.1, while CCRC and the county maintain the controlling statute is section 21166. As the court in *Laurel Heights II* noted, the only material difference between the two statutes is that under section 21092.1, recirculation of an uncertified EIR is required where the EIR is so fundamentally defective that it deprived the public of a meaningful opportunity to comment and under section 21166 such a flaw is not grounds for recirculation of a certified EIR. (*Laurel Heights II, supra,* 6 Cal.4th at p. 1130.) Here, there is no contention that either the EIR or SEIR was so fundamentally flawed that it deprived the public of a meaningful opportunity to comment. Indeed, as we have discussed, the arroyo toad issue was discussed in the 2003 EIR, was commented upon by Rural Canyons and was litigated in Rural Canyons's challenge to the 2003 EIR. Thus we need not and do not decide which statute applies here: in either case recirculation is required if any one of the first three circumstances discussed by the court in *Laurel Heights II* is present. (*Ibid.*)

Our review of the record fully supports the county's decision that none of the three circumstances requiring circulation are present here. Briefly, the new information provided by Haase in 2005 did not disclose either (1) a new substantial environmental impact from the project, (2) a substantial increase in the severity of an environmental impact, or (3) a feasible project alternative or mitigation measure.

The last circumstance requiring recirculation is of course the easiest with which to dispense: the arroyo toad observations plainly were neither a project alternative nor a mitigation measure. The first two circumstances—a new substantial environmental impact or a substantial increase in the severity of an impact—plainly require more analysis.

■ It bears emphasis that under *Laurel Heights II*, the county's focus and our focus must be on whether the information Haase reported was necessary to provide the public a meaningful opportunity to comment on the impact of the project on arroyo toads. (See *Laurel Heights II, supra*, 6 Cal.4th at pp. 1129, 1132.) "[A] new EIR is not required 'whenever "*any* new, arguably significant information or data" is proposed, "regardless of whether the information reveals environmental bad news." [Citation.]' [Citation.] Rather, the Guidelines clarify that the new information justifying a subsequent EIR must be 'of substantial importance' and must show that the project will have 'significant effects not discussed in the previous EIR or negative declaration,' that '[s]ignificant effects previously examined will be substantially more severe' than stated in the prior review . . . ." (*Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1057–1058 [76 Cal.Rptr.3d 428].) In this regard our opinion in *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 176 [43 Cal.Rptr.2d 501] (*River Valley Preservation*) is instructive.

In *River Valley Preservation* a transportation agency certified an EIR for a trolley extension through a river flood plain. The EIR assumed that the extension would require berms along 3,800 feet of the flood plain eight to 10 feet high; after the EIR was certified, the agency determined the berms would have to be 20 to 30 feet high. In rejecting the contention that the substantially higher berms required preparation and circulation on of a new environmental document, we relied on the fact that the original EIR "carefully reviewed, discussed and analyzed the effects of flood flows from the use of elevated berms (at eight to ten feet) including mitigation measures." (*River Valley Preservation, supra*, 37 Cal.App.4th at p. 177.) In light of the scope of the prior EIR, we concluded the change in the height of the berms was not a matter with "substantial environmental ramifications" warranting the preparation of a new environmental document. (*Ibid.*)

Thus, we begin our analysis by examining the rationale of the 2003 EIR with respect to the project's potential impact on the arroyo toad. The 2003 EIR concluded Silverado Canyon Ranch would have no substantial impact on the arroyo toad because, although the toad had been found in the vicinity, the toad had not been found on the project site and most significantly the project site was not a suitable habitat for the arroyo toad. As we have seen, in response to comments about the likely presence of toads in the area, the final 2003 EIR reexamined the suitability of the project site and again determined that it was not a suitable habitat for the arroyo toad. Plaintiffs themselves alleged in their 2003 petition the 2003 EIR reached this conclusion notwithstanding the fact that the toad had been found both upstream and downstream from the project site and notwithstanding that no toad surveys of the area were performed by the drafters of the EIR.

■ In this context, where it is apparent the drafters of the 2003 EIR assumed the toad was present in the general vicinity of the project but found the project itself was not a suitable habitat for the toads, appellants face something of a challenge in nonetheless arguing Haase's 2005 observation of toad larvae in Silverado Creek was significant new information, rather than an amplification or clarification of previously disclosed information. However, we must recognize Haase found the toad larvae within 330 feet of the project site and that the 2003 EIR only makes reference to toads being found within 1.5 km of the project site. Thus the question facing the county was whether observation of the toad that close to the project was new information requiring recirculation—that is information the public needed in order to meaningful comment on the project's impact.

As we have seen, rather than resolving the question without further data, CCRC and the county obtained further surveys in Silverado Creek, both in 2005 and 2006. As we have also seen, the later Bloom surveys were unable to duplicate Haase's observation. More significantly though, the CCRC biologist, Levine, did not believe Haase's larvae sighting substantially increased the probability that arroyo toads are present on the project site. Although disputed by the USFWS biologist, it is axiomatic that the county could rely solely on the CCRC biologist in finding that the Haase report did not represent significant new information. (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1397 [133 Cal.Rptr.2d 718].)[16]

While, in this "battle of the experts" noted by the trial court, the county was not required to accept the conclusion of the USFWS biologist, in our view the USFWS biologist's analysis nonetheless offers valuable insight on the question of whether, for recirculation purposes, Haase's observation represents *new material* information. As the biologist explained and Haase himself stated, arroyo toads, which had only previously been observed in the area in 1985, can remain buried in the soil for extended periods of time and are difficult to observe on a year-to-year basis.

Accepting the USFWS biologist's analysis of the Haase observation and the Bloom studies, the toads were likely present near the project site, but

---

[16] Plainly, Haase and Levine differ as to what constitutes a significant number of larvae. Under the governing and deferential "fair argument" standard of review, we are in no position to attack Levine's credibility based on his view of the significance of what Haase observed. (See *Laurel Heights II, supra,* 6 Cal.4th at p. 1135.) We also note the adult toads observed in 2005 were 1.5 miles from the project site; the 2003 EIR noted the toad observations were made 1.5 miles from the project site. In this context, the adult toad observations were in no sense new.

unobservable, at the time of the 2003 EIR. Thus, under the USFWS biologist's theory, what Haase reported was not the observation of a new condition, but the manifestation of a preexisting circumstance. As we have seen, this precise circumstance—the likelihood toads were in fact undetected but present near the project site—was the subject of comments on the draft 2003 EIR, the county's response to those comments and Rural Canyons's own 2003 petition.

In the end, then, even as viewed by the USFWS biologist, Haase's observations at most only amplified the very arguments made by commenters on the draft 2003 EIR and litigated unsuccessfully by Rural Canyons in its 2003 action.[17] Given this record, the county could quite reasonably conclude recirculation to include Haase's observation was not necessary to permit the public to make intelligent and meaningful comments on the impact of the project on arroyo toads. Rather, the county could reasonably conclude that the abundant record of prior public participation on the precise issue implicated by Haase's observation relieved the county of any obligation to recirculate either the 2003 EIR or the SEIR.[18]

[17] We agree with the dissent the 2003 EIR was subject to attack on the grounds it failed to consider what impact the project would have beyond the boundaries of the project site. In fact in response to the 2003 EIR, one commenter asserted the project would have "a significant *indirect* impact" on the arroyo toad. (Italics added.) The record further shows that Rural Canyons attacked the 2003 EIR on the broad grounds the EIR erroneously concluded the project did not have a significant impact on the arroyo toad. This attack was unsuccessful and the later discovery of toad larvae did not revive it. The comment to the 2003 EIR and Rural Canyons earlier broad claim illustrate the 2003 EIR was sufficient to bring the issue of indirect impacts to the public's attention and permit intelligent comment. Having failed to pursue that claim following entry of judgment in the 2003 litigation, Rural Canyons may not at this point raise it again. (See *Laurel Heights II, supra,* 6 Cal.4th at p. 1132.)

[18] Rural Canyons has requested that this court take judicial notice of certain items in the following seven categories: (1) excerpts from the administrative record prepared with respect to the 2003 EIR; (2) the portion of 16 United States Code section 1532 of the federal Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.) that contains the definition of the term "endangered species"; (3) an opinion of the Hawaii Supreme Court that addresses provisions of Hawaii's Environmental Policy Act; (4) a portion of an article about amphibians published by the San Diego Society of Natural History, and a portion of another article, entitled "Metamorphosis," from the Web site Wikipedia; (5) a regional map from public records that are on file with the county, and two "Google Earth" maps on which Rural Canyons has marked the purported location of the Santiago Canyon Road Bridge Station where the county collected water samples that it used to determine baseline data in the SEIR; (6) various court filings in the 2003 action; and (7) 2009 and 2011 proposed and final rules of the USFWS with respect to designation of critical habitat for the arroyo toad.

"There is . . . a precondition to the taking of judicial notice in either its mandatory or permissive form—any matter to be judicially noticed must be relevant to a material issue." (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2 [101 Cal.Rptr.2d 200, 11 P.3d 956]; see *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73], overruled on another point in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276 [63 Cal.Rptr.3d 418, 163 P.3d 106].) We decline to take

As the court in *Laurel Heights II* observed, in regulating recirculation the Legislature has attempted to further "public participation in the CEQA process [without] unduly prolonging the process so that the process deters development and advancement." (*Laurel Heights II, supra,* 6 Cal.4th at p. 1132.) Where, as here, new information does not materially implicate the public's right to participate, it cannot justify prolonging the environmental review process.

## II

### *The District's Appeal*

In June 2003, the District and CCRC entered into a written agreement in which CCRC agreed to dedicate approximately 46.3 acres of land known as "the Riviera" to the county as permanent regional open space and to contribute funds to be used for cleanup, restoration and enhancement of the Riviera. The agreement provided, among other things: "The sole obligation of the District under this Agreement is not to appeal and/or litigate CCRC's plans for development of the Project Site . . . as currently proposed."

The agreement also included a provision in which the District agreed to indemnify CCRC "from and against any and all liabilities, [l]osses, costs, expenses (including reasonable attorney's fees) . . . caused by, resulting from, or in any way connected with . . . the District's breach of this Agreement . . . ." That provision was followed by a reciprocal indemnity provision, in which CCRC agreed to indemnify the District against costs and expenses, including reasonable attorney fees, resulting from CCRC's breach of the agreement.

judicial notice of the items specified in categories 3 and 5 because those items are not relevant to our discussion or disposition of this matter. (*Moran v. Endres* (2006) 135 Cal.App.4th 952, 953, fn. 2 [37 Cal.Rptr.3d 786].) In addition, in a CEQA case, the only evidence that is relevant to the question of whether there was substantial evidence to support an agency's decision under review is evidence that was before the agency when it made its decision. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573, fn. 4 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) We decline to take judicial notice of the items in categories 4 and 7 because they were not before the county when it made its decision to certify the SEIR without revising it to address the arroyo toad sightings. We otherwise grant Rural Canyons's request for judicial notice.

CCRC has also asked that we take judicial notice of portions of the administrative record created with respect to the 2003 EIR. We grant CCRC's request.

Rural Canyons has also moved to strike a portion of the brief that CCRC filed in response to the amicus curiae brief that Center for Biological Diversity filed. We deny the motion but will disregard any improper material in CCRC's answering brief. (Cal. Rules of Court, rule 8.204(e)(1)(C); *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 405, fn. 14 [11 Cal.Rptr.2d 51, 834 P.2d 745]; *Matuz v. Gerardin Corp.* (1989) 207 Cal.App.3d 203, 206–207 [254 Cal.Rptr. 725].)

After the trial court denied the petition for writ of mandate in the instant CEQA action, CCRC filed a motion for attorney fees under Code of Civil Procedure section 1033.5, subdivision (a)(10)(A), which provides that attorney fees are allowable as costs when authorized by contract. CCRC sought fees and costs as the prevailing party, based on the provision in the agreement that the District's "sole obligation" was "not to appeal and/or litigate CCRC's plans for development of the Project Site." CCRC essentially argued the District breached the agreement by filing the instant action.[19]

The trial court granted CCRC's motion for attorney fees. In its order, the trial court did not expressly state the District had breached the agreement. However, the court noted that the District's "sole obligation" under the agreement was not to litigate CCRC's plans to develop the project, and stated: "In the event [the District] decided to litigate against CCRC regarding the Project, the District promised to [indemnify CCRC against costs, including reasonable attorney fees]." The court thus implicitly, but necessarily, found the District had breached the agreement by bringing the instant CEQA action against CCRC, and that the District was obligated to pay CCRC's attorney fees and costs under the indemnity provision. As we discuss, we conclude the trial court erred both procedurally and substantively in awarding CCRC attorney fees and costs against the District.[20]

---

[19] CCRC never expressly alleged in its motion for attorney fees that the District had "breached" the agreement. CCRC instead stated that "the District *reneged on* its promise in the Agreement by filing the instant CEQA lawsuit challenging [the project]," and that "[i]n *violation* of their agreement, . . . the District filed a new CEQA lawsuit against CCRC . . . ." (Italics added.) In its reply to the District's opposition to its motion for attorney fees, CCRC again cited the District's promise to indemnify CCRC for expenses, including attorney fees and costs, for the District's "breach of this Agreement" and the provision that states that the District's "sole obligation" under the agreement is not to litigate CCRC's plans to develop the project. CCRC asserted "the District's 'breach of this agreement' necessarily includes litigation concerning the [p]roject . . . ."

[20] The District has requested that we take judicial notice of the following three items: (1) an audit of its finances for fiscal year 2009, prepared by an independent accountant; (2) its budget for the fiscal year ending in June 2010, and the minutes of the meeting of its board of directors at which the board adopted the budget by resolution; and (3) a letter from the president of the board to the District's counsel dated March 12, 2010, in which the president sets out the District's current financial state. The District contends that the audit and letter to counsel are proper subjects for judicial notice under Evidence Code section 452, subdivision (c), as official acts of a public entity, and under subdivision (h), as sources of reasonably indisputable accuracy. The District maintains that the budget and minutes are subject to judicial notice under Evidence Code section 452, subdivision (b), as a legislative act, and under subdivision (c), as an official act of a public entity. Although the District's minutes are subject to judicial notice under Evidence Code section 452, subdivision (b) (see *Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 9, fn. 5 [40 Cal.Rptr.3d 205, 129 P.3d 394] [judicial notice taken of minutes of city council meeting]), we decline to take judicial notice of the minutes, or the other two items, because the current state of the District's finances, which all three items presumably are intended to show, is not relevant to a material issue in this appeal. In addition, neither the audit

## A. *Adjudication of the Alleged Breach in the CEQA Action*

 Procedurally, the trial court erred by adjudicating whether the District breached the agreement in the context of deciding CCRC's motion for attorney fees and costs. It is axiomatic that before a party may recover attorney fees as the prevailing party in an action on a contract, that party must in fact have prevailed in an action on the contract at issue. While CCRC prevailed in the CEQA action in the trial court, the instant CEQA action was not an action on the contract.

In seeking attorney fees as costs authorized by contract under Code of Civil Procedure section 1033.5, subdivision (a)(10)(A), based on the District's alleged breach of contract, CCRC's motion was governed by Civil Code section 1717 (notwithstanding the fact that CCRC did not cite that statute in its motion and has not cited it on appeal). Civil Code section 1717 applies to attorney fee awards that are authorized by contract and incurred in litigating claims that sound in contract. (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 615, 617 [71 Cal.Rptr.2d 830, 951 P.2d 399]; *Butler-Rupp v. Lourdeaux* (2007) 154 Cal.App.4th 918, 927 [65 Cal.Rptr.3d 242] [right to attorney fees founded in contract is controlled by Civ. Code, § 1717].) Because CCRC's request for attorney fees and costs was necessarily based on the claim the District breached the agreement and because the agreement provides for recovery of such fees and costs as a result of the breach, it is within the scope of Civil Code section 1717.[21]

Civil Code section 1717, subdivision (a) provides, in part: "In any *action* on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to

nor the letter to the District's counsel qualifies as an official act of a public entity or a source of reasonably indisputable accuracy.

[21] "Generally, the inclusion of attorney fees as an item of loss in a third party claim-indemnity provision does not constitute a provision for the award of attorney fees in an action on the contract which is required to trigger [Civil Code] section 1717." (*Carr Business Enterprises, Inc. v. City of Chowchilla* (2008) 166 Cal.App.4th 14, 20 [82 Cal.Rptr.3d 128].) However, Civil Code section 1717 applies to an indemnity provision that entitles the indemnitee to attorney fees incurred as the result of the indemnitor's breach of the contract that contains the indemnity provision. (*Continental Heller Corp. v. Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500, 508–509 [61 Cal.Rptr.2d 668] (*Continental Heller*); *Baldwin Builders v. Coast Plastering Corp.* (2005) 125 Cal.App.4th 1339, 1344–1346 [24 Cal.Rptr.3d 9] (*Baldwin Builders*) [Civ. Code, § 1717 applies to provision in indemnity agreement requiring indemnitor to pay indemnitee's costs, including attorney fees, incurred in enforcing the indemnity agreement].) Although the *Continental Heller* court did not cite Civil Code section 1717, its conclusion that the indemnity provision in question entitled the indemnitee to attorney fees in any action that it brought against the indemnitor for breach of contract brings the provision within the scope of Civil Code section 1717, as this court recognized in *Baldwin Builders, supra*, 125 Cal.App.4th at page 1345.

one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Italics added.)

Here, there was no *action* within the meaning of Civil Code section 1717, subdivision (a) on the contract that contains the attorney fee provision at issue. Rather, CCRC brought a *postjudgment motion* in which it requested contractual attorney fees as the prevailing party in the instant CEQA action, based on the attorney fee provision in the agreement. No breach of the agreement was raised or litigated in the CEQA action. As we have discussed, in granting CCRC's motion for attorney fees, the trial court necessarily adjudicated CCRC's claim the District breached the agreement by joining this action as a plaintiff. However, we are not aware of any authority that would support the proposition that a trial court may adjudicate a breach of contract in the first instance in ruling on a postjudgment motion for contractual attorney fees in an action that was not an action on the contract.

CCRC's argument it is entitled to attorney fees as a prevailing party in the instant CEQA action indicates it views the agreement as providing for the recovery of fees to the prevailing party in any CEQA action between the parties. However, the agreement provides for the recovery of attorney fees resulting only from the other party's breach of the agreement. *If* the District breached the agreement by joining the instant CEQA action against CCRC, that fact would not entitle CCRC to recover attorney fees and costs in the *instant* CEQA action. Rather, it would entitle CCRC to recover such reasonable fees and costs resulting from the breach in a *separate* action for breach of contract or express contractual indemnity under the indemnity provisions of the agreement, if CCRC prevailed in *that* action.

The prevailing party determination, for purposes of awarding attorney fees under a contract, "is to be made only upon *final resolution of the contract claims* and only by 'a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions.' " (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876 [39 Cal.Rptr.2d 824, 891 P.2d 804], italics added.) The trial court's adjudication of the District to be in breach of the agreement—when the breach was claimed for the first time in a postjudgment attorney fees motion—deprived the District of the opportunity to fully litigate the issue of breach, including pleading and engaging in discovery on any defenses to the claim, and engaging in discovery on the issue of the parties' contractual intent as to any material contract terms it might claim are ambiguous.

CCRC cites *Chinn v. KMR Property Management* (2008) 166 Cal.App.4th 175 [82 Cal.Rptr.3d 586] (*Chinn*), for the proposition a prevailing party must seek the recovery of attorney fees as costs in a postjudgment motion. The *Chinn* court held it was not necessary to pray for attorney fees in the complaint to recover contractual attorney fees as costs under Code of Civil Procedure section 1033.5, subdivision (a)(10), and due process was satisfied by a noticed motion for attorney fees. (166 Cal.App.4th at p. 194.) However, a critical distinction between *Chinn* and the present case is the party seeking attorney fees in *Chinn* brought the motion for attorney fees in an action of the type contemplated by, and therefore within the scope of, the attorney fee provision in the parties' contract, to wit: in an action in which the prevailing party unquestionably was entitled to attorney fees and costs under the subject contractual attorney fee provision. (*Id.* at p. 181.)

 Because the attorney fee provision at issue in this case authorized the recovery of fees and costs incurred only as a result of the other party's breach of the agreement, the party seeking attorney fees and costs was required to plead and prove the other party's breach of the agreement as a prerequisite to being entitled to recover its attorney fees and costs. The instant CEQA action was not within the scope of the attorney fee provision because it was not an action for breach of the agreement. In fact, the agreement was not implicated in the present action until CCRC invoked it in its postjudgment motion for attorney fees and costs. For these reasons, the trial court erred in adjudicating the issue of breach of the agreement in the context of CCRC's motion for attorney fees and costs and in granting the motion.

### B. *Merits of Breach Adjudication*

Because the parties have fully briefed the merits of the substantive issue of whether the District breached the agreement, in the interest of judicial economy we review the trial court's ruling on that issue. (See *Bosco v. Justice Court* (1978) 77 Cal.App.3d 179, 182 [143 Cal.Rptr. 468].)

Substantively, we conclude the trial court's ruling that the District breached the agreement was erroneous because the agreement expressly *defines* a breach as the failure to cure an alleged breach after receipt of proper notice of the alleged breach, and CCRC failed to give the District proper notice of breach. Under the heading "Breach and Default, Right to Cure," the

agreement states: "A Party shall be deemed in breach of this Agreement *only* upon the failure to perform any obligation under this Agreement after receipt of written notice of breach and failure to cure such breach within thirty (30) days thereafter . . . ."[22] (Italics added.) Thus, the agreement does not simply require that a party give notice of breach as a prerequisite to bringing an action for breach. Rather, the agreement defines breach as the failure to perform any obligation *after* receipt of written notice of breach *and* failure to cure within 30 days after receipt of the notice.

 " 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation. [Citation.] Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning.' " (*Santisas v. Goodin, supra,* 17 Cal.4th at p. 608.)

The provision of the agreement that defines a breach is not ambiguous. The clear and explicit meaning of the provision is that a party may be held in breach of the agreement *only* after receiving written notice of breach from the other party by prepaid certified mail or courier and failing to cure the breach within 30 days of receiving that notice. There is nothing in the record showing CCRC provided the District with such notice of breach, or that it accorded the District 30 days to cure the alleged breach as expressly required under the agreement.

CCRC contends its opposition to the District's motion to transfer this action to San Diego County provided adequate notice of breach because those papers contained the following argument heading: "The District is Estopped Because it Agreed Not to Oppose the Project."[23] Under that heading, CCRC noted the District agreed in writing not to oppose the project. CCRC asserted "[t]he District specifically agreed not to appeal or litigate any County approvals for the [p]roject," and went on to note that the District chose not to oppose the project from June 2003, when it entered into the agreement with CCRC, until September 2007, when it first objected to the project. CCRC concluded these facts showed "the District knew of the [p]roject and had chosen not to litigate against it." CCRC contends this argument, together with the argument heading, "manifestly provided notice of the District's breach of

---

[22] The agreement further states that "all notices required herein shall be in writing and sent by prepaid certified mail or by courier . . . ."

[23] The quoted argument heading is a subheading under the following heading in bold type: **"The District is Estopped from Joining the Continuing Case to Seek Transfer."**

the [a]greement." CCRC also notes it cited the agreement in its opposition papers, and attached a copy of the agreement to those papers.

Although this portion of CCRC's opposition to the motion to transfer shows CCRC viewed the District's joining in this action as inconsistent with the District's promise not to oppose the project, it did not constitute direct notice to the District that CCRC believed the District breached the agreement and start the clock ticking for the District to cure within 30 days the alleged breach. Indeed, the term "breach" does not appear anywhere in the opposition papers. CCRC's opposition to the motion to transfer was thus insufficient to constitute notice of breach under the express provisions of the agreement, and therefore did not trigger the 30-day period to cure.[24]

Because the agreement unambiguously provides the District shall be deemed in breach of the agreement *only* upon its failure to perform any obligation under the agreement *after receipt of written notice of breach and failure to cure the breach within 30 days*, the trial court erred in ruling the District breached the agreement, and CCRC was therefore entitled to recover attorney fees under the agreement.

## DISPOSITION

The judgment denying the "New and Supplemental Petition for Peremptory Writ of Administrative Mandamus and Complaint for Injunctive Relief" is affirmed. The county and CCRC are awarded their costs with respect to Rural Canyons's appeal. The order awarding CCRC attorney fees against the District is reversed. The District is awarded its costs on appeal.

Nares, J., concurred.

---

[24] In a footnote, CCRC contends "[e]ven if redundant notice by certified mail was technically required under the [a]greement, the District's manifest acknowledgement of the [a]greement would render it futile and unnecessary." We decline to address this contention because it is raised only in a footnote, and is not specified by a separate heading or subheading, as required by California Rules of Court, rule 8.204(a)(1)(B). (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 542 [78 Cal.Rptr.3d 1]; *Roberts v. Lomanto* (2003) 112 Cal.App.4th 1553, 1562 [5 Cal.Rptr.3d 866] [reviewing court may disregard contention asserted in footnote but not raised in a properly headed argument]; *Placer Ranch Partners v. County of Placer* (2001) 91 Cal.App.4th 1336, 1343, fn. 9 [111 Cal.Rptr.2d 577]; *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830–1831, fn. 4 [41 Cal.Rptr.2d 263] [failure to head an argument as required by California Rules of Court, former rule 15(a) (currently rule 8.204(a)(1)(B)) constitutes a waiver].) In passing, however, we note that upon proper notice as provided in the agreement the "clock began to run" for the District to cure the alleged breach within 30 days of such notice.

**AARON, J.,** Concurring and Dissenting.—

I.

*Introduction*

It is *undisputed* that larvae of the arroyo southwestern toad—*an endangered species*—were observed 328 feet from the project site, and adult toads were seen in the same general area, *after* the original environmental impact report (EIR) circulated. The original EIR had concluded that the project would not result in a direct or indirect impact to any species listed as threatened or endangered, and specifically, that the probability that the arroyo toad was present at the project site was "very low" because the habitat was not suitable. Despite the subsequent discovery of this endangered species so close to the project site, and *despite having conceded in the supplemental EIR (SEIR) that the post-EIR sightings of arroyo toad tadpoles in the immediate vicinity of the project site constitute "new information,"* the County of Orange (County) contends that it was not required to recirculate the SEIR to address the potential impact of the project on this endangered species, and disingenuously maintains that, "it is unclear from the record whether arroyo toads exist near the project."

Under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) Guidelines,[1] recirculation is required if new information shows that the project will have a *"potential* [impact on] endangered, rare or threatened species"* such as the arroyo toad. (Guidelines, § 15065, subd. (a)(1), italics added.) There is simply no evidence in the record to support a finding that the project will not have at least a *potential* impact on the arroyo toad, and there is abundant evidence that the project will have such an impact.

The majority's analysis rests entirely on the fallacy that because the toad has not been observed *on the project site itself,* the project will not have a potential significant impact on the toad or its habitat. However, it is undisputed that arroyo toad larvae and adult toads were discovered as near as

---

[1] All further statutory references are to the Public Resources Code unless otherwise specified. References to "Guidelines" are to the administrative guidelines for the implementation of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.) The California Supreme Court "has not decided the issue of whether the Guidelines are regulatory mandates or only aids to interpreting CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278].) However, the Supreme Court has instructed that at minimum, "courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Ibid.*)

within 328 feet from the project site.[2] It is also undisputed that the dispersal zone of the arroyo toad is 1,000 feet. The project site is thus unquestionably within that zone. Even if the toad has not been observed on the project site itself, it does not follow that the project will not have a potential significant impact on the toad or its habitat, as discussed, *post*.

Because there is no evidence in the record that supports the County's finding that the project will have no potential significant impact on the arroyo toad or its habitat, I dissent from part IB of the majority opinion in which the majority concludes that the County was not required to address the potential impact in a revised SEIR.[3]

## II.

*There is no evidence in the record to support the County's finding that "the Arroyo Toad is not present on the project site, and therefore, implementation of the project . . . will not affect, either directly or indirectly, the toad or toad habitat."*

A subsequent or supplemental EIR must be prepared by the lead agency or by any responsible agency if "[n]ew information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (§ 21166, subd. (c).) "The [CEQA] Guidelines . . . generally define 'new information' as information which shows that the project will have new or more severe 'significant effects' on the environment not disclosed in the prior EIR." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1125 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*), citing Guidelines, § 15162, subd. (a).) "A 'significant effect' is further defined in the Guidelines as a 'substantial, or potentially substantial, adverse change.' " (*Laurel Heights II, supra*, at pp. 1125–1126, citing Guidelines, § 15382.) Under the Guidelines, a "*potential* . . . impact on endangered, rare or threatened species" (italics added) such as the arroyo toad, is deemed "per se significant." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 449 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard*), citing Guidelines, § 15065, subd. (a)(1).) When the test for "new information" is satisfied, section 21166 *requires* preparation of a subsequent EIR. (*Environmental Council v. Board of Supervisors* (1982) 135 Cal.App.3d 428, 437 [185 Cal.Rptr. 363].)

---

[2] The majority opinion suggests that the only new information, post-EIR, is "Haase's 2005 observation of toad larvae in Silverado Creek." (Maj. opn., *ante*, at p. 306.) In fact, approximately a month after Haase observed the larvae only 328 feet from the project site, he reported observing adult toads in the same area.

[3] I concur in part IA and part II of the majority opinion.

An independent review of the record reveals that there is no substantial evidence to support the County's determination that "the [a]rroyo [t]oad is not present on the project site, and therefore, implementation of the project, including the proposed water quality mitigation measures[,] will not affect, either directly or indirectly, the toad or toad habitat."

Zoologist Robert Haase—who, unlike Peter Bloom and David Levine, is not affiliated with any party to this case—prepared field observation reports in April and May of 2005 in which he documented sightings of both arroyo toad larvae and adult arroyo toads very near the project site. He provided copies of those reports to the United States Fish and Wildlife Service (USFWS) and to California's Department of Fish and Game (CDFG). In June 2005, biologist T'Shaka A. Toure reported sighting 25 to 35 arroyo toads between the stages of late tadpole to early metamorphosis "in the same general area as the Haase sightings of 4/23/05."

In a letter dated June 6, 2007, from USFWS to CCRC Farms, LLC, and the County regarding Haase and Toure's arroyo toad sightings, USFWS stated that it was "concerned about this population of arroyo toads because it appears to be a relatively small population that breeds intermittently and therefore may be vulnerable to threats such as loss and degradation of habitat." After noting that the Bloom surveys, which were conducted later in 2005 and 2006, did not document arroyo toads, USFWS stated: "[W]e still believe there is a high likelihood that arroyo toads are present in the Silverado Canyon Ranch property." USFWS set forth a number of reasons to support that conclusion, including (1) the fact that arroyo toads are known to move into upland habitat over one kilometer (or 0.62 miles) from the nearest stream, and the project site was well within that dispersal range; (2) there were no substantial barriers to arroyo toad dispersal from where the toads were sighted to the project site; and (3) the project site contained suitable upland habitat for arroyo toads.

Respondents *do not dispute* that Haase and Toure observed arroyo toads near the project site in 2005. The original EIR, which was certified in 2003, stated that the probability of occurrence of the arroyo toad on the project site was "very low; no suitable habitat; nearest population is 1.5 [kilometers] away in Silverado Creek." In fact, in discounting the need for a protocol-level search of the area to ascertain whether the arroyo toad might be present, the EIR stated, "Based on the existing conditions at the Silverado Ranch site and the fact that this species has not been located in similar habitats in this

region, there is little justification for a detailed study *to conclusively determine the absence of the species from the site.*" (Italics added.) The original EIR thus essentially concluded that there were no arroyo toads present on the site, or for that matter, "in the region," and therefore, that "[t]he proposed project would not result in direct or indirect impacts to any sensitive species listed as threatened or endangered by the USFWS or CDFG."[4] The Haase sightings, which occurred *after* the County issued the original EIR, demonstrate the inaccuracy of the EIR with respect to the presence of the arroyo toad, and clearly constitute "new information" under section 21166.[5]

In upholding the County's decision not to revise the SEIR to address the new information concerning the arroyo toad and circulate it for public comment, the trial court indicated that it viewed Haase's reports of arroyo toad sightings, and Bloom's report of no arroyo toad sightings, as a "battle of the experts."[6] The trial court cited case law supporting the proposition that when an agency is faced with conflicting evidence on a CEQA issue, it "is 'permitted to . . . favor the opinions and estimates of some of the experts over the others.' [Citation.]" (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1397 [133 Cal.Rptr.2d 718].) The trial court stated, "Haase *opined* that [his sighting of arroyo toads] 'serves to confirm that breeding-age adult [toads] occupy this portion of the drainage and its adjacent habitat' " (italics added), and went on to note that the Bloom surveys found no evidence of arroyo toads in July 2005 and 2006. The trial court appears to have cited the Bloom surveys as constituting substantial evidence, in the form of expert *opinion*, supporting the County's determination that it need not revise the SEIR to address the project's impact on arroyo toad habitat and circulate a revised SEIR for public comment, because "the Arroyo Toad is not present on the project site, and therefore, implementation of the project . . . will not affect, either directly or indirectly, the toad or toad habitat." The majority adopts similar reasoning.

---

[4] The arroyo toad is listed as an endangered species under the federal Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.).

[5] As noted, under section 21166, "new information" is information showing that the project would have new or more severe "significant effects" on the environment, within the meaning of the Guidelines, that were not disclosed in the original EIR (*Laurel Heights II, supra,* 6 Cal.4th at p. 1125; Guidelines, § 15162, subd. (a)). A "significant effect" is defined as a substantial or *potentially* substantial adverse change. (Guidelines, § 15382.)

[6] The majority opinion implies that the "battle of the experts" (maj. opn., *ante,* at p. 306) to which the trial court referred was between the USFWS and CCRC biologist Levine. In fact, the court was referring to Haase's reported sightings and surveys conducted by CCRC biologist Bloom in which Bloom reported that he did not observe the arroyo toad in the areas where Haase observed them. The Bloom surveys were the *only* evidence that the County cited as support for its determination of the issue.

Contrary to this view, the Haase and Toure reports of arroyo toad sightings, and Bloom's report of no arroyo toad sightings, do not present conflicting expert *opinion*. Rather, they report different *observations* made at different times. The Haase and Toure reports constitute *undisputed* evidence of the presence of arroyo toads very near the project site. In fact, the SEIR *acknowledges* the discovery of arroyo toad tadpoles in Silverado Creek and *concedes* that this discovery constitutes "new information." The relevant portion of the SEIR reads: "*The fact that arroyo toad tadpoles were observed in Silverado Creek is new information.*"

The County's finding that, "the Arroyo Toad is not present on the project site, and therefore, implementation of the project . . . will not affect, either directly or indirectly, the toad or toad habitat," is based *solely* on Bloom's report that he did not find evidence of arroyo toads during his surveys. The relevant portion of the SEIR states, "[B]*ased on the results of* [*the Bloom surveys*], the Arroyo Toad is not present on the project site, and therefore, implementation of the project . . . will not affect, either directly or indirectly, the toad or toad habitat." (Italics added.) As discussed above, however, the Bloom survey does not support these conclusions. Rather than constituting substantial evidence to support this finding, the Bloom surveys establish only that Bloom found no evidence of arroyo toads *on the footprint of the project itself.* Bloom's surveys do not support the conclusion that the project will not have a potential significant impact on the toad or its habitat. Bloom *did not dispute* the Haase or Toure sightings, and he expressed no view as to whether, given the Haase sightings, the project could have a potential significant impact on the toad or its habitat. Yet, *respondents cite no evidence in the record, other than Bloom's report, as support for the County's finding that the arroyo toad is not present on the project site, and therefore, that the project will not affect the toad or its habitat.*

The majority cites the testimony of biologist Levine, who, the majority observes, "did not believe Haase's larvae sightings substantially increased the probability that arroyo toads are present on the project site." (Maj. opn., *ante*, at p. 306.)[7] As the majority notes, Levine testified that the *only* information that was not in the original EIR " 'is that there are larvae found in 2005 . . . . That is the only fact that we have to deal with. Where those larvae came from, what the adults were, whether or not those turned into—metamorphed into adults, nobody knows. [¶] . . . [¶] . . . *If we've only got a handful of*

---

[7] The County did not mention Levine's opinions in the SEIR, nor did it cite his testimony in its briefing on appeal as evidence supporting its determination in this case. The County's failure to cite Levine's testimony is likely attributable to the fact that, as discussed in the text, his opinions are based on the inaccurate assumption that the only new, post-EIR information is the sighting of "a handful" of larvae near the project site.

*larvae,*[8] *no adult sightings, the probability of* [*the toads reaching the project site*] *gets to be very far removed.* You know, many orders of magnitude for that actually to occur that there be an adult toad estivating on the Holtz Ranch. That would be a very unlikely event in my opinion . . . .' " (Maj. opn., *ante,* at p. 294, italics added.)

Levine's testimony should be disregarded in its entirety because his basic premise, i.e., that only "a handful" of larvae and no adult toads were seen near the project site, is inaccurate. As noted, *ante,* Haase reported seeing larvae in "significant numbers," and also reported sighting adult toads in the same general area, and Toure reported observing 25 to 35 arroyo toads in the stages of late tadpole to early metamorphosis in the same general area as the Haase sightings. Levine clearly either misunderstood or intentionally misrepresented Haase's report. In any event, Levine's conclusion that arroyo toads are probably not present on the project site is based on the erroneous assumption that only a small number of larvae were observed near the project site. Further, Levine focused only on the question whether "arroyo toads were present *on the project site*" (maj. opn., *ante,* at p. 294, italics added), or more specifically, whether they were " 'estivating on the Holtz Ranch,' " *which is not the relevant inquiry.*

The relevant inquiry under CEQA is whether there is new information, i.e., information that was not known and could not have been known at the time the EIR was prepared, showing that the project will have new or more severe "significant effects" on the environment not disclosed in the prior EIR. As noted above, under the CEQA Guidelines, a *"potential* . . . impact on endangered, rare or threatened species" such as the arroyo toad, is deemed "per se significant." *(Vineyard, supra,* 40 Cal.4th at p. 449, italics added, citing Guidelines, § 15065, subd. (a)(1).) The toad need not be present *on the project site* in order for the project to impact the toad or its environment. The

---

[8] Contrary to Levine's characterization, Haase states in his report, "Larvae of the arroyo toad *(Bufo californicus)* were observed *in significant numbers* in Silverado Creek." Haase continued, "The presence of arroyo toad larvae in this reach of Silverado Creek *serves to confirm that breeding-age adult individuals occupy this portion of the drainage and its adjacent upland habitat.*" In an exhibit to a letter to the County Board of Supervisors expressing its concern about the post-EIR sightings of the arroyo toad "adjacent to" the project site, the Silverado Modjeska Recreation and Park District stated that Haase, "confirmed an arroyo toad *colony* about 330' (125m) from Lot #1 of the Silverado Canyon Ranch Project." (Italics added.)

The majority asserts that Haase's 2005 sightings of adult toads "were in no sense new" (maj. opn., *ante,* at p. 306, fn. 16) because the 2003 EIR reported that arroyo toads had been seen 1.5 miles from the project site. The majority fails to acknowledge, however, that the fact that arroyo toad larvae were seen 328 feet from the project site—at the point where drainage from the project would flow into Silverado Creek—clearly establishes, as Haase stated, that breeding age *adult* toads occupy that area *as well as the adjacent upland area.*

evidence in the record clearly establishes that the project may have a significant impact on the arroyo toad and its habitat.

In its letter dated June 6, 2007, USFWS stated that the Bloom surveys that reported no arroyo toad sightings, "were inadequate to determine that arroyo toads are absent from the property or the surrounding environment. The surveys by Mr. Bloom in 2005 were not protocol surveys, as they were conducted primarily in late July after most toads in this portion of their range have metamorphosed and become harder to detect because they are buried underground or are foraging in the upland environment. In 2006, it was much drier than in 2005, and it appears that there was no breeding along Silverado Creek that year. [¶] Although arroyo toads were not observed at Silverado Creek in 2006, they can remain buried in the soil for extended periods of time, emerging to breed or forage only when conditions are appropriate, so based on the observation of breeding arroyo toads at this location in 2005, it is likely that toads are still present in suitable habitat along Silverado Creek. This population of arroyo toads appears to breed intermittently and may be particularly difficult to observe on a year to year basis, as evidenced by the fact that, prior to 2005, the last documented observation of arroyo toads in the immediate area was in 1985 . . . ."

In a similar vein, Haase told the county planning commission that 2006 was a bad year for detecting arroyo toads. He stated, "I work with . . . Arroyo Toads all the time every day, and I didn't detect any Arroyo Toads [in 2006] in known habitat on Camp Pendleton where they are well-known to occur." He added that the arroyo toad "can be cryptic for long periods of time and remain in upland habitats. They only go to extreme channels to breed. At the time that the 2006 survey was done . . . the conditions did not exist to detect [arroyo] toads, period."

There is no evidence in the record that refutes USFWS's and Haase's assertions that the arroyo toad can remain underground and undetectable for long periods of time, including during dry periods. The Bloom report establishes only that Bloom did not observe the arroyo toad; it does not disprove that arroyo toads were observed near the project site in 2005, nor does the Bloom report negate USFWS's conclusion that it is likely that arroyo toads are still present in that area. Bloom apparently was never asked, and did not address, whether the toad might still be present near the project site.

Throughout its opinion, the majority adopts Levine's mischaracterization of the nature of the Haase sightings, repeatedly stating that Haase reported sighting arroyo toad larvae in Silverado Creek, and concluding that the sighting of larvae does not have "significant environmental ramifications."

The majority appears to disregard the fact that Haase also reported sighting several adult toads, and that Toure reported sighting 25 to 35 arroyo toads between the stages of late tadpole to early metamorphosis in the same general area, *after* the original EIR—which concluded that it was unlikely that the arroyo toad was present in the area—had circulated.[9]

III.

*The project will have a potential significant impact on the*
*arroyo toad and its habitat regardless of whether the toad is*
*present on the project site*

The majority's conclusion that the project will not impact the toad or its habitat because the toad has not been observed on the project site itself, is fallacious. If the County's statement in the SEIR that the arroyo toad "is not present on the project site" refers to the fact that the toad has not been seen within the "footprint" of the project, that fact clearly does not support the inference that the project will have no effect on the toad or its habitat. Again, it is *undisputed* that arroyo toad larvae were observed as near as within 328 feet of the project site in 2005, including in Silverado Creek, immediately adjacent to the site, and that adult toads were seen in the same general area a month after the larvae sightings. It is also undisputed that the dispersal zone of the arroyo toad is 1,000 feet. The project site is thus undisputedly within the dispersal zone. If the toad remains in the immediate area, as the USFWS and Haase believe, there is no evidence in the record that would support the conclusion that the project—the development of 12 custom homes on 68.7 acres—would not have a potential adverse impact on the toad or its habitat. In fact, the only evidence in the record on this point is to the contrary. The administrative record contains abundant evidence and information showing that the project *will* have at least a *potential* significant impact on the arroyo toad or its habitat in the area near the project site where Haase observed the arroyo toads.

As noted, in its June 6, 2007 letter to CCRC and the County regarding the arroyo toad sightings, USFWS expressed concern "about this population of arroyo toads because it appears to be a relatively small population that breeds intermittently *and therefore may be vulnerable to threats such as loss and degradation of habitat.*" (Italics added.) With its original briefing, Rural Canyons Conservation Fund submitted a USFWS proposed designation of

---

[9] In fact, the EIR stated, "Based on the existing conditions at the Silverado Ranch site and the fact that this species has not been located in similar habitats in this region, there is little justification for a detailed study to conclusively determine the absence of the species from the site.".

critical habitat for the arroyo toad from the Federal Register[10] in which USFWS discusses the toad's specialized requirements for breeding habitat.[11] USFWS noted that high waterflow will wash eggs out of breeding pools, "breaking up the egg strands and killing the developing embryos." USFWS also reported that "[s]ilt eroding into the streams from road crossings [and] adjacent roads [and] overgrazing . . . can cover and suffocate the eggs," and that "metamorphosing and newly metamorphosed toads are extremely susceptible to predation, habitat disturbance, and activities in the streams during this period, as they cannot escape."

USFWS further reported:

"Human activities that affect water quality, influence the amount and timing of nonflood flows or frequency and intensity of floods, affect riparian plant communities, or alter sedimentation dynamics can reduce or eliminate the suitability of stream channels for arroyo toad breeding habitat. Degradation or loss of surrounding riparian and upland habitats reduces and eliminates foraging and overwintering habitat. The introduction of nonnative plant and animal species can reduce the quality of all habitats used by arroyo toads; lead to detrimental levels of competition and predation, or reduce the availability of toad food. Run-off from roads can decrease habitat quality for arroyo toads and roads provide access for humans, domestic animals, and invasive species that can lead to additional habitat degradation.

"The effects of such activities and factors may not become apparent until many years later when the habitat finally becomes sufficiently degraded that arroyo toads can no longer reproduce and survive. Combined with the normal climatic fluctuations in the arroyo toad's range, which can include consecutive years of extremely high or low rainfall, *human impacts can cause temporary or permanent extirpations of toads from some areas. Human*

---

[10] This document is included in the portion of Rural Canyons's request for judicial notice that we have granted. (Maj. opn., *ante*, at pp. 307–308, fn. 18.)

[11] In its supplemental brief, Rural Canyons notes that after oral argument in this case, the USFWS issued its final rule designating revised critical habitat for the arroyo toad. The USFWS designated as critical habitat 737 acres of land—*including the location of Haase's 2005 sighting of larvae 328 feet downstream of the project site*, and other Silverado Creek sites a mile downstream of the project, where Haase and Toure observed toads, tadpoles and larvae. As part of its designation, the USFWS noted that "new information" including the 2005 Haase survey, "indicates that Silverado Creek includes occupied suitable habitat." As Rural Canyons points out, this rule is published in the Federal Register, and is thus subject to the mandatory judicial notice provisions of the Evidence Code. Thus, the majority's assertion that Haase's observations merely amplified information that was contained in the 2003 EIR—which concluded that the project site "was not a suitable habitat for the arroyo toad" (maj. opn., *ante*, at p. 305), is inaccurate.

*activities that may cause adverse impacts to arroyo toads include urbaniza-
tion and agriculture within and adjacent to riparian habitats, the use of
pesticides and herbicides within or adjacent to arroyo toad habitat, . . . water
flow manipulations, . . . road placement across and within stream terraces,
livestock grazing, off-highway vehicle use of roads and stream channels,
placement of campgrounds and other recreational facilities in arroyo toad
habitat (especially on stream terraces), and the use of stream channels and
terraces for recreational activities.*" (Italics added.)

The project unquestionably will involve, or result in, some of the types of
human activity that, according to the USFWS, pose a potential threat to the
arroyo toad. For example, the original EIR for the project notes that initial
grading and infrastructure construction for the project, including road con-
struction, will involve 239,500 cubic yards of cut and fill, and that "[w]ith
remedial grading, a total of approximately 450,000 cubic yards of cut and fill
will be balanced on-site." In addition, the County's draft SEIR reported that
clearing, grading, excavation, and construction activities associated with the
project "may impact water quality due to sheet erosion of exposed soils and
subsequent deposition of particles and pollutants in drainage areas. Grading
activities, in particular, lead to exposed areas of loose soil, as well as
sediment stockpiles, that are susceptible to uncontrolled sheet flow. The use
of materials such as fuels, solvents, and paints also present a risk to surface
water quality due to an increased potential for non-visible pollutants entering
the storm drain system. If uncontrolled, these materials could lead to water
quality impacts, *including the discharge of sediment-laden runoff, prohibited
non-storm water discharges, and ultimately the degradation of downstream
receiving water bodies, such as Silverado Creek and the Santa Ana River.
This is considered a potentially significant impact.*" (Italics added.)

A letter to the County from Canyon Lakes Conservation Fund concerning
the post-EIR arroyo toad sightings noted that Haase observed arroyo toad
larvae "at the confluence of where 'silt eroding' from the pre-project con-
struction activities dumped into Silverado Creek." As noted, USFWS reported
that silt eroding into streams can cover and suffocate arroyo toad eggs. In
addition, a Silverado resident testified before the County that soil and debris
from a pad that CCRC or one of its subcontractors illegally graded prior to
the certification of the original EIR fell into Silverado Creek and was washed
directly onto the area where the arroyo toads were sighted. Further, a letter to
the County submitted on behalf of two conservation groups, Center for
Biological Diversity and Endangered Habitats League, informed the County
that the arroyo toad population that was observed at the confluence of

Silverado Creek and Santiago Creek in the 1970's and 1980's "may represent one of the last remnants of a greater historic population that existed in the Santa Ana River basin that was mostly extirpated due to urbanization of the greater Los Angeles metropolitan area . . . . This [area] is essential because it contains primary constituent elements, such as low-gradient sandy streams and adjacent upland terraces for foraging, burrowing, and aestivation. (70 Fed.Reg. 19586.)"

In view of the above evidence and information, which was presented to the County before it certified the SEIR, it is disingenuous to maintain that because the arroyo toad has not been observed on the project site itself, the project will not have a potential significant impact on the toad or its habitat. The only reasonable conclusion is that the project will have at least a *potential* adverse impact on the arroyo toad or its habitat if, as USFWS believes, arroyo toads are still present in the area near the project site where Haase observed them. The County cites no evidence other than evidence to the effect that the toad *is not on the project site*, and fails entirely to address potential offsite impacts of the project.

## IV.

### Conclusion

The uncontroverted sightings of the endangered arroyo toad near the project site *after* the original EIR was certified and during the public comment period for the SEIR, unquestionably constitute new information that showed that the project would have a new or more severe "significant effect" on the environment than was disclosed in the original EIR, within the meaning of section 21166 and Guidelines section 15162, subdivision (a). The new or more severe effect of the project is "significant" under the Guidelines because, as discussed above, there is evidence that the project will result in a "potentially substantial . . . adverse change" to arroyo toad habitat (Guidelines, § 15382; see *Laurel Heights II, supra*, 6 Cal.4th at p. 1126), and therefore will have a "potential . . . impact on [an] endangered, rare or threatened species . . . ." (*Vineyard, supra*, 40 Cal.4th at p. 449; see Guidelines, § 15065, subd. (a)(1).) The USFWS's designation of portions of Silverado Creek, including the site of the Haase sightings, as "critical habitat" for the arroyo toad, underscores this point.[12]

---

[12] The analogy that the majority draws between the post-EIR discovery in this case of the presence of an endangered species within 328 feet of the project site and the post-EIR determination in *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154 [43 Cal.Rptr.2d 501] that berms necessary to complete a transit project would have to be 20 to 30 feet high, rather than eight to 10 feet high as stated in the EIR, to support the conclusion that the discovery of the arroyo toad is not a matter with

Because the evidence of the presence of arroyo toads very near the project site, within the dispersal zone of the toad, is new information that was not known and could not have been known at the time the original EIR was certified, but became available before the SEIR was certified, and because there is no evidence in the record to support the conclusion that the project will not have a potential significant impact on the toad or its habitat, I would hold that the County was required, under section 21166, to include that information in the SEIR before circulating it for public comment.

A petition for a rehearing was denied August 4, 2011. Aaron, J., was of the opinion that the rehearing should be granted.

---

" 'significant environmental ramifications' " (maj. opn., *ante*, at p. 305) warranting the preparation of a new environmental document is, to say the least, inapt.