Filed 2/13/24  Marriage of J.C. and M.C. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of J.C. and M.C. | |
| J.C., | G062261 |
| Respondent, | (Super. Ct. No. 15D005137) |
| v. | O P I N I O N |
| M.C., | |
| Appellant. | |

Appeal from orders of the Superior Court of Orange County, Carmen R. Luege, Judge.  Affirmed in part and reversed in part.

Law Offices of Lisa R. McCall, Lisa R. McCall and Erica M. Barbero for Appellant.

No appearance for Respondent.

This appeal involves a custody dispute between appellant M.C. (Mother) and respondent J.C. (Father) over their child, R.C., who has significant special needs. By the time of the original judgment, Father had moved to Northern California. The judgment granted Mother sole legal and physical custody of R.C. and allowed Father only limited visitation.

After Father returned to Orange County, he filed a request for order seeking joint legal and physical custody and increased visitation. After holding an evidentiary hearing, the trial court concluded Father's return constituted a significant change in circumstances warranting modification of the custody arrangement. The court granted the parents joint legal and physical custody and expanded Father's visitation with R.C. beyond Father's specific requests. It also issued orders regarding R.C.'s schooling, prohibiting his homeschooling and requiring an updated individualized education plan (IEP).

On appeal, Mother challenges the trial court's changes to the custody arrangement, as well as its visitation and schooling orders. Regarding custody, Mother asserts various procedural errors but primarily contends there was no substantial change of circumstances justifying modification of the prior arrangement. As for visitation and schooling, Mother claims the court erred by issuing orders neither party had requested.

As discussed below, we conclude Father's return to Orange County constituted a sufficient change in circumstances supporting a modification in the custody arrangement, and we find no reversible error in the trial court's custody orders. We also conclude the court's visitation orders were within the scope of the issues before it. However, the court's schooling orders were not requested by either party, were not litigated at the evidentiary hearing, and did not pertain to issues otherwise before the court. Accordingly, we reverse that portion of the court's orders. We affirm the orders in all other respects.

FACTS

I. *The Family and Initial Dissolution Proceedings*

Mother and Father married in 2010 and had R.C. in January 2011. R.C. was diagnosed with autism spectrum disorder at a young age, and this diagnosis was subsequently confirmed twice, with providers stating he had "'severe symptoms'" or was "'in the severe range.'" In 2012, the parents separated and Father filed a petition to dissolve the marriage.

The family initially lived in the bay area, but Mother subsequently moved to Orange County with R.C. Father had overnight visits with R.C. on alternating weekends. He later moved to Orange County himself.

II. *The Evidence Code Section 730 Report and Father's Move to Sacramento*

In 2016, the trial court (Judge Daphne Grace Sykes) appointed Dr. Amy Stark, a psychologist, to conduct a custody and visitation evaluation under Evidence Code section 730. In February of the following year, while Stark's evaluation was still ongoing, Father lost his job. He told Stark he "fear[ed] he might have to move to Sacramento to move in with his dad . . . so he c[ould] get a job."

Stark completed her evaluation and issued her report (the 730 report) in May 2017. In her report, Stark described the uncertainty about Father's potential move and stated this was "one of the biggest limitations" to her report. The report included an extensive discussion of the family and its dynamics. Among other things, Stark noted Father's belief that R.C. "barely ha[d] minor autism." She also described R.C.'s schooling: Mother was homeschooling him, and he was attending a school for homeschooled children three days a week.

After surveying the family's circumstances, Stark opined: "To date, the majority of the decision making has been [Mother]'s. . . . [¶] [S]ome of the fault in this is [Father]'s. He balks at everything and does not want to pay for it instead of understanding what his son's needs are and being a part of a plan to get them met. He is

3

communicated with but does not step up and do his portion . . . .  Some of the problem . . . is because [Mother] is the driver of the car and telling him what needs to be done.  She is making the decisions and announcing the results to him."

Stark recommended Mother receive "primary physical custody" of R.C. but that the parents receive joint legal custody.  However, she added that if Father moved away, Mother should have primary legal custody, "with information to [F]ather as necessary."[1]  Stark also opined that R.C. "need[ed] to be in school every day" and that "[t]here c[ould] be no home schooling."  Sometime after Stark's completion of the 730 report, Father in fact moved to Sacramento.

III.  *The 2021 Judgment*

In 2019, the trial court (then Judge Maurice Sanchez) held a trial on permanent custody and visitation arrangements.  In March 2021, the court issued its judgment, granting Mother sole legal and physical custody of R.C.  It granted Father visitation for one weekend a month, with various conditions he was to meet to be allowed to have R.C. overnight, including the requirement that Father give R.C. dietary supplements as prescribed by the child's doctor.  The court also ordered Father to complete a high-conflict parenting course, attend an anger management program, and educate himself on autism.

IV.  *Father's Return to Orange County and the Parties' Requests for Orders*

Shortly after the 2021 judgment, Father moved back to Orange County, to a residence less than one mile from Mother and R.C.'s residence.  In October 2021, on Mother's request, the trial court suspended Father's overnight visits pending proof that he has satisfied the conditions in the judgment.  The court later suspended Father's visits altogether because Father withheld R.C. overnight.

---

[1]        Elsewhere in her report, Stark stated the parents should have joint legal custody, without mentioning her alternative recommendation should Father move away.

4

In November, Father filed a request for order, seeking joint legal and physical custody of R.C. He also sought additional visitation, asking to return to alternate weekends with overnight stays. Mother opposed these requests, asserting there was no change in circumstances that could justify a change in custody. She additionally claimed Father had engaged in various kinds of misconduct, including making disparaging comments about her to R.C. and, on one occasion, screaming at Mother and "put[ting] his hand in [her] face" in front of the child.

The trial court (Judge Carmen R. Luege) appointed counsel for R.C., and following a hearing, temporarily restored and increased Father's visitations with R.C., granting him alternating weekends without overnights, among other provisions. The court later temporarily expanded Father's visitations further, including by granting him weekend overnight visits.

At one of the parties' status hearings, R.C.'s counsel described her conversations with R.C., the parties, and various third parties. Among other things, she noted that Father did not agree with R.C.'s autism diagnosis but that according to the child's therapist, R.C. was "very autistic" and counsel agreed with the therapist. Counsel also noted that Father thought R.C. should be in a traditional school with a normal curriculum.

In August 2022, R.C.'s counsel submitted a declaration stating she had spoken with the child's therapist, who was concerned about his "regression and aggressive behaviors." According to the therapist, R.C. was intentionally breaking items in session and threatening her. She noted that R.C. was watching violent movies and playing violent games with Father and had recently gone to see Jurassic World with Father, later having nightmares. According to the therapist, although R.C. was 11 years old, "he [was] developmentally more like age [eight]." Counsel reported that Father placed all blame for R.C.'s behavioral issues on Mother.

5

That same day, Mother filed a request for order seeking to reduce Father's visitation, including by removing overnight visits. Mother reported R.C. had a host of behavioral and health issues that had recently developed or worsened, which she attributed to his time with Father. Among other things, Mother included a declaration from Anita Patten, a behavioral therapist and R.C.'s private swimming instructor. Patten described a recent incident with R.C. at the pool. According to her, R.C. started entering the pool using the stairs and said the water was cold, although it was the usual temperature. Patten and Mother tried to talk R.C. through the issue, but he insisted on going home and became increasingly agitated and ultimately violent, leading Mother to place him in a "safety hold." R.C. remained aggressive and violent, trying to hurt Mother and threatening to kill her, Patten, and others. This continued for 25 minutes, until R.C. was calm enough to leave.

The parties' competing requests for orders were set for a hearing in October 2022.[2] Because Father had not completed the number of sessions of anger management the 2021 judgment ordered, the court ordered him to attend 10 more sessions by the time of the hearing.

Before the hearing, the parties submitted a joint statement of issues for trial, which reflected, inter alia, Father's request for joint legal and physical custody of R.C. and an expanded visitation schedule that included weekends with overnights and a short Wednesday evening visit. Father included no request regarding R.C.'s schooling.

V. *The Evidentiary Hearing*

At the start of the evidentiary hearing, the trial court indicated to the parties that it might not issue permanent custody orders at the conclusion of the proceeding, stating: "I'm not certain the end of all of this is I issue final orders" and "I'm not

---

[2] Mother's counsel estimated the parties would need half a day for the hearing. The court noted that half a day amounted to three hours, but ultimately allotted the parties two hours per side.

6

promising final orders." The court then heard the testimony of Father, Mother, and Mother's child psychology expert, Dr. Daniel B. Pickar.

A. *Father's Testimony*

At the hearing, Father testified about the parents' marriage and divorce proceedings, as well as his relationship with R.C. Mother was still homeschooling R.C., who was now attending school only twice a week. Discussing his compliance with the 2021 judgment, Father provided evidence of his handling of R.C.'s dietary supplements, his self-education on autism (he had purchased several books, read one and was halfway through another), and his progress in an anger management program (he had one session left, which he had been unable to complete before the hearing). Father previously provided proof he had completed a high-conflict parenting course.

On cross-examination by R.C.'s counsel, Father said he did not believe the autism diagnosis fit the child and he wanted to get a second opinion. He allowed R.C. to watch Jurassic Park but did not believe the movie caused the child's aggressive behaviors. He did not let R.C. watch any kind of movie the child wanted to watch. He knew Mother and R.C.'s medical team believed the child's mental age was younger than his biological age, but he believed this was in part because Mother was treating R.C. like a little boy. Father treated R.C. according to his actual age and believed the child had responded well. R.C. had not been violent while in Father's care.

Mother's counsel then cross-examined Father about his failure to complete the anger management classes the trial court had ordered in the 2021 judgment, the details of the program he was currently attending, and various other issues not pertinent to this appeal. It is unclear how long Mother's counsel cross-examined Father, but the examination spanned about nine pages of the reporter's transcript. At that point, the court stopped counsel's questioning, noting that Mother's allotted time was running out and the court wanted to hear the testimony of Mother and Pickar. The court notified counsel that if Mother had time left over after those testimonies, she could recall Father.

7

B.  *Pickar's Testimony*

At the trial court's instruction, Pickar provided his direct testimony in writing and answered additional questions by the trial court and Mother's counsel.  Pickar was a clinical and forensic child psychologist with expertise regarding children with autism and divorce.  He had not conducted a child custody evaluation of the family and could not make recommendations on a parenting plan.  According to Pickar, Father's state of denial about R.C.'s diagnosis, lack of cooperation with Mother, and high level of hostility toward her suggested he would be unable to successfully coparent R.C. and advocate for the services the child needed.  He opined these circumstances "should lead the court to have tremendous caution regarding the appropriateness of joint legal custody."  Pickar similarly cautioned the court against allowing Father to continue to have overnight visits, stating the evidence he reviewed suggested overnight visits with Father "have caused extreme emotional dysregulation, aggression, and regression in R[.C.]"

Pickar explained autistic children may engage in "masking" or "social masquerading" when placed in novel situations, meaning they put a lot of energy into appearing normal in that setting, but the attendant stress manifests when they return to their comfortable environment.  He believed that was happening here—R.C. was rising to the occasion with Father, but was not capable of sustaining it, and therefore was acting out upon returning to Mother's home.

The trial court related the pool incident to Pickar and asked if the expert thought R.C. was angry during the incident because the child felt he was being pressured to stay in the pool.  Pickar replied:  "I think it's a great question.  It would be purely conjecture.  I don't know what he was responding to.  He could have been responding to that or carrying stress with him where he reached a limit around something and was having difficulty adjusting that day or back into [Mother]'s home.  It could have been a number of things."

8

C.  *Mother's Testimony*

Mother testified about her relationship with R.C., his activities while in her care, and his education.  She claimed that R.C. had no regular bedtime at Father's home and that Father would allow the child to get up after bedtime or early in the morning and play videogames unattended.  After Mother answered her counsel's question on whether she had ever tried to teach R.C. to tie his shoes, the trial court said it was going to direct counsel "in a little way."  The court noted it believed Mother was dedicated to R.C. and took good care of him.  It added that Mother was "a very competent parent" and her competency was not in question; instead, the court was focused on the claimed reasons to limit Father's role in R.C.'s life.

Mother proceeded to testify about her concerns with Father's care of R.C. According to Mother, after the 2021 judgment, R.C. "was doing amazing."  But after Father received temporary expanded visitation, R.C. showed significant regression: among other symptoms, he became aggressive, including by threatening his therapist and throwing things in her office; he was having nightmares; and he was wetting the bed more frequently.  Mother thought this was partly because he was watching movies and playing video games that were not age appropriate.  She did not think the change in R.C.'s behavior had to do with puberty because he had not yet gone through puberty. Mother claimed Father had not provided R.C. the right dosage of dietary supplements, which resulted in the child getting rashes and having gastrointestinal distress.

After Mother concluded her testimony, the trial court asked Father about his administration of R.C.'s supplements, and Father responded that Mother had not given him the updated protocol at the time.  The court later said it intended to order that R.C.'s doctor communicate any change in protocol to Father directly.  At the close of the hearing, R.C.'s counsel expressed concern that if the court gave Father joint legal custody, the parties would soon be back in court when Father "has decided the child is not autistic and doesn't need behavioral therapy and occupational therapy."  In response,

9

the court addressed Father, advised him that whether R.C. was autistic was not in question in the court's mind, and warned him, "Don't go there."

Shortly before the close of evidence, the trial court told the parties it intended to issue only temporary orders. The court repeated similar statements after the close of evidence. Mother's counsel asked the court for a statement of decision but did not specify the controverted issues as Code of Civil Procedure section 632 requires.

VI. *The Trial Court's Tentative Ruling and Proposed Statement of Decision on Custody*

In December 2022, the trial court issued its tentative ruling and proposed statement of decision on custody issues. In this tentative ruling, the court gave the parents joint legal and physical custody of R.C., on a permanent basis. The court recognized that a party requesting a change to a permanent custody arrangement must show a substantial change in circumstances. It concluded that Father's return to Orange County was a sufficient change in circumstances.[3]

The trial court relied heavily on the 730 report and found that "the dynamic between the parents described by Dr. S[t]ark continues to exist today." The court found joint custody would "equalize the role of the parents" by removing Mother from a position of control and allowing Father to take R.C. to appointments with medical providers without having to obtain permission from Mother. According to the court, this would force Father to assume greater responsibility over R.C.'s wellbeing, rather than simply criticize Mother's decisionmaking and the medical providers she chose.

The court additionally stated joint custody would allow the parents to reconsider "their parental perspectives," and it found Mother's "parental perspective lack[ed] reasonable balance." The court believed the pool incident illustrated this. According to the court, Mother "could have prevented or mitigated the entire incident" by

---

[3] The trial court also suggested that the 2021 judgment may be "void" for various reasons, rendering a substantial change unnecessary, but it did not vacate that judgment because Father had not challenged it.

10

allowing R.C. to leave the pool soon after he asked to go home because the water was cold, rather than trying to "'talk[] him through'" the issue. It opined, "Mother may be too focused on controlling [R.C.]'s behavior rather than figuring out what triggers his anger so she can anticipate it and avoid it." The court added: "Mother's insistence that R[.C.]'s anger and aggression is the result of . . . Father's involvement in his son's life . . . fails to consider that R[.C.] may be starting to experience hormonal changes due to his age that may affect his mood. Another possibility is that R[.C.], as a pre-teen, is naturally rebelling against the adults in his life who frequently attempt to control his behavior."

As for Father's perspective, the trial court stated he likely had "a distorted perception of R[.C.]'s cognitive and physical limitations," noting Pickar's testimony about masking. But according to the court, the solution to this problem was to allow Father to spend more time with R.C.

In addition to the trial court's custody orders, the court's tentative ruling included an order for the parties to obtain an updated IEP for R.C. The court based this order in part on its finding that Father had not been able to participate in the prior IEP.

VII. *The Trial Court's Order on Visitation and Schooling*

Shortly after its tentative ruling on custody, the trial court issued a temporary order on visitation, schooling, and other issues. As relevant here, the court expanded Father's visitation time with R.C., allowing him not only alternate weekends with overnights but also midweek overnight visits from Tuesday afternoon to Thursday morning, every week. The court also included orders on R.C.'s schooling, instructing that "[t]he child shall be in school every day of the week" after the end of his winter break and that homeschooling was prohibited unless ordered by the court.

VIII. *The Trial Court's Final Order and Statement of Decision on Custody*

Mother objected to the trial court's proposed statement of decision on custody. Among other things, she asserted the court exceeded its jurisdiction by

11

awarding relief not requested by Father, including greater visitation, the prohibition on homeschooling, and an updated IEP. In January 2023, the trial court issued its final statement of decision, making no significant changes from its proposed statement of decision.[4] The court stated Mother's claims about the scope of its orders concerned its visitation and schooling orders, which the court said were not part of its statement of decision. It concluded those objections were therefore procedurally improper and declined to address them.

Mother timely appealed, challenging the trial court's orders changing the parents' custody arrangement, as well as the court's visitation and schooling orders. Father did not file a respondent's brief.[5]

DISCUSSION

I. *The Custody Change*

Challenging the trial court's custody orders, Mother asserts, inter alia: (1) there was no substantial change in circumstances that could warrant a custody change; (2) the court disregarded evidence that increased time with Father led to behavioral regression in R.C.; (3) the court's statements at the evidentiary hearing reflected its misapprehension of the law; (4) the court improperly relied on its analysis of the pool incident; and (5) the court violated her due process rights in various ways. As explained below, we find no reversible error and therefore affirm the court's custody orders.

---

[4] The trial court again suggested the 2021 judgment may be void but clarified that it was nevertheless applying the substantial change in circumstances standard. The court noted Father had the burden to establish changed circumstances and found he had met this burden.

[5] As the appellant, Mother bears the affirmative burden to show error, regardless of Father's failure to file a brief, "and we 'examine the record and reverse only if prejudicial error is found.' [Citation.]" (*Smith v. Smith* (2012) 208 Cal.App.4th 1074, 1078.)

12

A. *Applicable Law*

"In an initial custody determination, the trial court has 'the widest discretion to choose a parenting plan that is in the best interest of the child.' [Citation.] It must look to all the circumstances bearing on the best interest of the minor child. [Citation.]" (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 31-32 (*Burgess*), italics omitted.) After a final judicial custody determination has taken place, "a party seeking to modify [the] order can do so only if he or she demonstrates a significant change of circumstances justifying a modification." (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 256.)

"'The [changed circumstance] rule requires that one identify a prior custody decision based upon circumstances then existing which rendered that decision in the best interest of the child. The court can then inquire whether alleged new circumstances represent a significant change from preexisting circumstances, requiring reevaluation of the child's custody.' [Citation.]" (*Burgess, supra*, 13 Cal.4th at p. 37.) The change of circumstances must be ""'of a kind to render it essential or expedient for the welfare of the child that there be a change."'" [Citation.]" (*Id.* at p. 38.)

"We review a ruling on a request for modification of a custody order for abuse of discretion. [Citation.]" (*Anne H. v. Michael B.* (2016) 1 Cal.App.5th 488, 501.) "An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice. [Citations.] This standard of review affords considerable deference to the trial court provided that the court acted in accordance with the governing rules of law. We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise. [Citations.]" (*Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, 158.)

B. *Analysis*

We conclude the trial court did not abuse its discretion in granting the parents joint legal and physical custody of R.C. Father's return to Orange County constituted a change of circumstances sufficient to warrant a change in custody arrangements. Father lost his job in Orange County during Stark's evaluation, and he told Stark he "fear[ed] he might have to move to Sacramento to move in with his dad . . . so he c[ould] get a job." Stark believed the uncertainty about Father's potential move was "one of the biggest limitations" to her report. Thus, she recommended the parents receive joint legal custody of R.C. but added that *if* Father moved away, Mother should receive primary legal custody "with information to [F]ather as necessary."[6] Stark's conditioning of her recommendation for joint legal custody made sense. If Father moved away and could not remain in close and continuous contact with R.C., a child with significant special needs, it would be difficult for him to have a beneficial role in R.C.'s life as a joint legal custodian.

Stark also recommended Mother receive "primary physical custody." As a leading treatise explains: "The terms 'primary physical custody' and 'primary caretaker' are not the equivalent of sole physical custody and, indeed, have no legal meaning. (They are commonly used by courts, however, to distinguish between levels of physical responsibility for children under various types of shared parenting plans.)" (Hogoboom et al., Cal. Practice Guide: Family Law (The Rutter Group 2023) ¶ 7:302, p. 7-145.) Regardless of the precise meaning of Stark's recommendation, Father's move to Sacramento rendered shared physical custody all but moot. It is therefore unsurprising that after Stark issued her report and Father moved away, the trial court granted Mother sole legal and physical custody of R.C. Under these circumstances, Father's return to

---

[6] Mother's assertion that Stark's recommendations "were to remain whether Father remained in Orange County or moved to Northern California" is therefore incorrect.

14

Orange County when it became feasible was indeed a significant change that supported the court's decision to revisit the prior custody arrangement.[7] (See *Burgess, supra*, 13 Cal.4th at p. 38).

Mother lists an array of asserted faults in Father's conduct she claims showed no significant change had occurred justifying modification. These include, inter alia, that Father: continued to disagree that R.C. was autistic; violated prior orders by failing to educate himself about autism and to complete anger management and high-conflict parenting classes; improperly dosed R.C's medication and supplements; allowed R.C. to watch age-inappropriate movies; and derided Mother in front of R.C. Mother also highlights that R.C. experienced regression in various areas and started to exhibit significant aggressive behavior around the time he started having overnight visits with Father. She claims the court disregarded this evidence.

Mother's description of several of these items is inaccurate or incomplete. For instance, by the time of the evidentiary hearing, Father had begun to educate himself about autism, had completed a high-conflict parenting class, and was one session away from completing an anger management program. As for R.C.'s medication and dietary supplements regimen, Father testified Mother had not given him an updated protocol, and in response, the court announced it intended to order that R.C.'s doctors communicate any change in protocol to Father directly.

Other issues Mother references raise legitimate concerns about Father's ability to serve as coparent, not the least of which was his continued refusal to accept that R.C. is autistic, which may well be at the root of some of his other deficiencies. But that does not mean the trial court's decision exceeded the bounds of reason. (*Mejia v. City of Los Angeles, supra*, 156 Cal.App.4th at p. 158.) At the evidentiary hearing, the court

---

[7]     Given our conclusion that Father's return to Orange County constituted a sufficient change of circumstances, we need not consider the trial court's suggestion that the 2021 judgment may be void.

15

addressed Father's disagreement with the autism diagnosis, told him this was not an open question in the court's mind, and warned him not to seek to disprove this diagnosis. In its statement of decision, the court noted Father likely had "a distorted perception of R[.C.]'s cognitive and physical limitations." Yet the court apparently believed Father's attitude resulted in part from the limited involvement he had been permitted to have in R.C.'s life. Per the court's view, allowing Father to spend more time with R.C. and to seek assessments from other medical experts would force Father to assume greater responsibility, rather than simply criticize Mother's decisionmaking and R.C.'s medical providers. This was consistent with the 730 report's description of the family dynamics.[8] The wisdom of the court's approach may be debatable, but its analysis was not irrational.

Contrary to Mother's contention, the trial court did not disregard evidence about R.C.'s behavioral regression. It simply was unpersuaded that this was the result of R.C.'s exposure to Father, explaining in its statement of decision: "Mother's insistence that R[.C.]'s anger and aggression is the result of . . . Father's involvement in his son's life . . . fails to consider that R[.C.] may be starting to experience hormonal changes due to his age that may affect his mood. Another possibility is that R[.C.], as a pre-teen, is naturally rebelling against the adults in his life who frequently attempt to control his behavior."[9] Mother's disagreement with this conclusion does not establish that the court abused its discretion.

Mother also finds fault in various comments the trial court made at the hearing. For example, Mother argues the court's oral statements show it assigned her the

---

[8]    Mother claims the trial court placed too much weight on the 730 report, given that Stark produced it more than five years before. But despite the passage of time, the 730 report remained highly relevant to the court's analysis, given the court's finding that "the dynamic between the parents described by Dr. S[t]ark continues to exist today."

[9]    Mother takes exception to the trial court's characterization of R.C. as a "pre-teen" because, according to Mother's evidence, R.C. was like an eight-year-old in terms of his mental development. But R.C. was in fact a pre-teen, and Mother does not contend that his physical development was delayed.

16

burden to prove why the existing custody arrangement should not be changed. She acknowledges, however, that the court's statement of decision properly recognized Father had the burden to justify a modification. We do not consider Mother's contentions about the court's oral comments, which cannot serve as a basis to challenge its order. (*Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 300 ["'[A] judge's comments in oral argument may never be used to impeach the final order'"].)

Mother contends the trial court erred by relying solely on the pool incident to conclude that "Mother may be too focused on controlling [R.C.]'s behavior rather than figuring out what triggers his anger so she can anticipate it and avoid it." The court opined Mother "could have prevented or mitigated the entire incident" and noted the incident as illustration of its finding that Mother's "parental perspective lack[ed] reasonable balance." According to Mother, in so finding, the court minimized the evidence of her "excellent care of [R.C.]"

The trial court's conclusion that Mother's perspective "lack[ed] reasonable balance" is not at odds with the evidence of her competent and dedicated care for R.C., which the court never questioned. Assuming without deciding that the court erred in its analysis of the pool incident, Mother has not established there was a reasonable probability of a ruling more favorable to her absent the claimed error, as is her burden.[10] (*County of Los Angeles v. Nobel Ins. Co.* (2000) 84 Cal.App.4th 939, 945 ["'appellant bears the duty of spelling out in his [or her] brief exactly how the error caused a

---

[10]     The trial court's conclusion that Mother could have "prevented or mitigated the entire incident" by allowing R.C. to leave the pool soon after he expressed his displeasure appears rash. It is by no means unreasonable for a parent to encourage their child not to give up on an activity because of an inconvenience. And as noted, Mother worked together with a behavioral therapist to address R.C.'s reluctance to continue with the lesson. Nothing in the record suggests their approach was so wrongheaded as to call Mother's judgment into question. We observe that when the court asked Pickar if he thought R.C. was angry because the child felt he was being pressured to stay in the pool, the expert replied this "would be purely conjecture."

17

miscarriage of justice'"]; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [miscarriage of justice occurs when "'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error'"].) Indeed, Mother presents no reasoned argument that the court's reliance on the pool incident was prejudicial. We observe that the court cited several factors independent of the pool incident in support of its ruling on custody. Accordingly, the court did not reversibly err.

Mother additionally claims the court violated her due process rights by: (1) cutting off her presentation of evidence regarding her care of R.C.; (2) curtailing her cross-examination of Father; and (3) making permanent custody orders after informing the parties it would issue only temporary orders. We disagree.

First, the trial court did not cut off Mother's presentation of evidence regarding her care of R.C. The court merely apprised her counsel—who had just asked Mother if she had ever tried to teach R.C. to tie his shoes—that it had no doubts about Mother's competence as a parent and counsel would do better to focus on the claimed reasons to limit Father's role in R.C.'s life.

Second, the trial court did not improperly curtail Mother's cross-examination of Father. After R.C.'s counsel fully cross-examined Father, Mother's counsel conducted his own cross-examination spanning about nine pages of the reporter's transcript. It is unclear exactly how long that examination took. At that point, the court stopped the questioning, noting that the time allotted to Mother was running out and the court wanted to hear the testimony of Mother and her expert, Pickar.[11] The court told counsel that if Mother still had time after she and her expert testified, she could recall

---

[11]     An hourly time limit imposed on one side typically includes time spent in examining the adverse party's witnesses, in addition to time spent in examining its own witnesses. (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 20-21.)

Father. Thus, the court did not curtail Mother's cross-examination of Father but merely held her to her allotted time.

Finally, Mother's conclusory assertion that the trial court violated due process by making permanent custody orders after stating it would make only temporary ones is insufficient to establish error. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court'"].) Moreover, we observe the court initially said it *might* make only temporary orders, making such comments as "I'm not certain the end of all of this is I issue final orders" and "I'm not promising final orders." Nothing in these statements suggested final orders were off the table. The court's more definitive statements came just before and after the close of evidence, and Mother does not explain how those statements could have prevented her from presenting her case. In short, we see no reversible error in the court's modification of the custody arrangement.

## II. *Visitation and Schooling Orders*

Mother contends the trial court erred by granting Father greater visitation rights than he had asked for and making orders regarding R.C.'s schooling neither party had sought.[12] We agree the court erred by issuing the schooling orders and therefore reverse in part.

A trial court's judgment may not exceed the issues raised by the pleadings or litigated at trial. (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1024.) "Although some informality and flexibility have been accepted in marital dissolution proceedings, such proceedings are [generally] governed by the same statutory

---

[12] In the fact section of her brief, Mother notes that the trial court issued numerous other orders not requested by the parties. However, she does not address those orders specifically in the argument section of her brief, and we therefore do not consider their propriety. (*Browne v. County of Tehama* (2013) 213 Cal.App.4th 704, 726 [failure to raise contention in argument section of opening brief constitutes forfeiture].)

19

rules of evidence and procedure that apply in other civil actions . . . ." (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1354.)

The Orange County Superior Court requires parties to a family law case to "file a joint statement of issues to be tried at least five court days prior to the trial or hearing date." (Super. Ct. Orange County, Local Rules, rule 709(c).) As noted, in the parties' joint statement, apart from his specific visitation requests, Father asked for joint physical custody. It is certainly unusual for a trial court to grant a parent greater visitation rights than the parent expressly requests, in the face of objections by the other parent. Nevertheless, we conclude the court's visitation orders did not exceed the scope of the contested issues submitted by the parties, given Father's request for joint physical custody. "'Joint physical custody' means that each of the parents shall have significant periods of physical custody." (Fam. Code, § 3004.) Although the Family Code does not say what amounts to significant time with each parent, courts have held that "where 'a father has a child only 20 percent of the time, on alternate weekends and one or two nights a week, this amounts to sole physical custody for the mother with "liberal visitation rights" for the father.'" (*Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 664.) Thus, Father's request for joint physical custody placed Mother on notice that he sought significant additional time with R.C. (See *ibid.*) And at the evidentiary hearing, Mother vigorously opposed and presented her evidence against granting Father overnight visits.

The trial court's schooling orders are different. The parties' joint statement of issues for trial made no mention of R.C.'s schooling situation, let alone a request to prohibit homeschooling or order an updated IEP. Nor did Father raise these issues during the hearing. To be sure, R.C.'s counsel described a conversation with Father in which Father told her that R.C. should be in a traditional school. Additionally, the parties described R.C.'s schooling at trial, and the 730 report (issued for purposes of the 2021 judgment) addressed R.C.'s schooling situation. But none of that suggested a court order prohibiting homeschooling or requiring an updated IEP was on the table at the time of the

20

hearing. Mother therefore had no opportunity to present evidence bearing on whether homeschooling was appropriate for R.C. or whether an updated IEP was necessary. In issuing the schooling orders, the court reversibly erred.[13] (See *Elkins v. Superior Court, supra*, 41 Cal.4th at p. 1357 [denial of right to offer relevant and competent evidence on material issue is "'almost always considered reversible error'"].)

## DISPOSITION

The trial court's orders pertaining to R.C.'s homeschooling and an updated IEP are reversed. In all other respects, the court's orders are affirmed. We award no costs on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


GOODING, J.

---

[13] The trial court's unexpected schooling orders and its critique of Mother's conduct in the pool incident prompt us to remind the court that family law cases involve delicate matters that can have far-reaching consequences for all involved, and they therefore call for a sensitive and judicious approach.